**James M. RIDENOUR, As Director of the Indiana Department of Natural Resources, Defendant–Appellant,**

**v.**

**Clay FURNESS, Chris Furness, Jeff Furness, Mike Brzinski, Harold Bucy, Chris Camalick, Clem Cho, Bill Dickerson, John Hart, Lance Kaeding, Tom Mayoch, Howard Westerman, and Phil Smidt, Inc., Plaintiffs–Appellees.**

**No. 06A01–8903–CV–76.**

Court of Appeals of Indiana, First District.

Nov. 21, 1989.

---

Linley E. Pearson, Atty. Gen., Michael Schaefer, Deputy Atty. Gen., Office of Atty. Gen., Indianapolis, for defendant-appellant.

Timothy F. Kelley, Jan E. Sherman, Munster, Steven Kovachevich, Gary, for plaintiffs-appellees.

BAKER, Judge.

## STATEMENT OF THE CASE

Defendant-appellant, James M. Ridenour, Director of the Indiana Department of Natural Resources (the DNR), appeals from a judgment entered on its action to recover the damages sustained from an injunction erroneously imposed in favor of plaintiff-appellees, Clay, Chris and Jeff Furness, Mike Brzinski, Chris Camalick, Clem Cho, Bill Dickerson, John Hart, Lance Kaeding, Howard Westerman, Phil Smidt, Harold Bucy, and Tom Mayoch (the fishermen).

We reverse and remand.

## STATEMENT OF THE FACTS

For over two decades, the DNR has been actively involved in enhancing and protect-

ing the ecology of Lake Michigan. Of the many measures instituted in that regard, the DNR commenced operation of a program which raises various types of fish, including chinook salmon and lake trout, to be stocked in the Indiana waters of Lake Michigan. The purpose of the stocking program is to introduce a new species of fish that will, in time, adapt to the ecosystem and regenerate itself. Chinook salmon are stocked in various Indiana tributaries normally in the spring of the year at which point they are 3½ inches long. The salmon are released for stocking at this size because it is at this time that they are in smolt. Smolting is that stage of the fish's life cycle at which it receives a biological imprint of its place of stocking to which it will return to spawn at the end of its life cycle. The natural mortality rate of the stocking effort ranges as high as 30% of the fish released and is incurred within the first three to four months of stocking. The fish that survive are approximately 9 to 14 inches in length by the following September and October. By the time the individuals of the stocking program achieve this size, mortality is drastically reduced and it is highly likely that they will survive to spawning. Thus, salmon of this size are of great significance to the stocking program.

Another protection effort taken in coordination with the stocking program, involved a monitoring program of the commercial fishing industry on Lake Michigan. The monitoring program was conducted in order to ascertain the effect of gill net fishing on the population of various species of protected sport fish including chinook salmon and lake trout. Gill fishing nets are commonly deployed by commercial fishermen in order to catch perch fish. A gill net also incidentally catches a variety of other fish as well, however. Following several years of study, DNR fisheries biologists concluded that immature chinook salmon and lake trout dominated the catch of fish incidentally caught and destroyed in the gill nets utilized by commercial perch fishermen. As a result of the monitoring studies, the DNR promulgated an emergency order on August 22, 1986, temporarily banning the use of gill fishing nets by commer-

cial fishermen for a 47–day period from September 15 to October 31, 1986. The stated purpose of the ban was to prevent the incidental catch of salmon and trout by commercial fishermen using gill nets.

In response, the fishermen filed suit in Marion Circuit Court seeking to enjoin the DNR from enforcing the emergency order. The fishermen also moved for a temporary restraining order. Following a hearing on the motion for a temporary restraining order, the Marion Circuit Court, on September 12, 1986, enjoined the DNR's enforcement of the gill net ban. Upon stipulation by the parties, the cause was venued to the Boone Circuit Court which subsequently denied the DNR's motion to dissolve the preliminary injunction. On appeal, the Indiana Court of Appeals reversed the preliminary injunction entered against the DNR. *Ridenour v. Furness* (1987), Ind. App., 504 N.E.2d 336. That decision was subsequently approved by the Supreme Court of Indiana on transfer. *Ridenour v. Furness* (1987), Ind., 514 N.E.2d 273.

The DNR then returned to the trial court seeking to recover damages it suffered because of the erroneous injunction. Specifically, the DNR sought damages for the value of the salmon and trout incidentally caught and destroyed by those fishermen who continued to fish with gill nets during the period of the erroneous injunction. Additionally, the DNR sought as damages the amount of profits on the harvest of perch fish earned by the fishermen while under the protection of the injunction. Thereafter, the fishermen filed a motion for partial summary judgment on the perch profit element of damages sought by the DNR. Following a hearing on the motion, the trial court granted the partial summary judgment.

The cause then proceeded to trial on the issue of the damages sustained from the incidental catch of the protected sport fish. DNR fisheries biologist, Dan Brazo (Brazo), testified on behalf of the DNR. Brazo explained that the DNR conducted a monitoring study of the perch harvest and the incidental catch of sport fish in gill nets at the start of the 1986 calendar year before

the gill net ban was challenged. During the year, 81 monitoring trips were made, 29 of which were conducted from September 15 through October 31. The study culminated in a report which documented the number of fish and species monitored. Brazo estimated that a total of 6,044 salmon and trout were incidentally caught in gill nets during the period in question. The study also documented the size of each species of fish incidentally caught during the period. On this basis, Brazo determined that the salmon and trout incidentally caught in the gill nets ranged from 9 to 16 inches in length. Brazo also concluded that chinook salmon were juvenile and primarily from the 1986 stocking effort.

The DNR determined to assign a value for the various species of sport fish incidentally caught according to the individual size or weight of the fish as set forth in the American Fisheries Society (AFS), Pub. No. 13. Upon this basis, Brazo testified that the total value for the 6,044 salmon and trout incidentally caught to be $21,383.58. On the other hand, the fishermen argued during their case-in-chief that the DNR's actual hatchery production cost of producing a 3½ inch fingerling fish was the appropriate method for assessing the damages incurred by the DNR. The fishermen produced evidence establishing that the DNR's hatchery production costs for the fish varied between $.09 and $.57 per fish depending upon the species of fish raised. As an alternative method of assessing damages, fishermen, Mayoch and Bucy, offered into evidence a contract between the state of Michigan and a private contractor accompanied by a cover letter from an official with the Michigan Department of Natural Resources. That letter explained that Michigan valued maturing salmon at $1 to $3 per pound and permitted a liquidated damage value of the greater of $10 per fish or $10 per pound. In its findings of fact and conclusions of law, the trial court accepted the actual hatchery production cost theory of damages, but permitted allowance for a 50% mortality rate between the time of stocking and the time of the incidental catch. On this basis the trial court assessed damages in favor of the DNR in the

amount of $1,906.16. The DNR subsequently instituted this appeal.

## ISSUES

The DNR raises the following issues for our review:

I. Whether the trial court correctly assessed damages for the protected species of sport fish destroyed during the period of the erroneous injunction.

II. Whether the DNR is entitled to recover as damages the profits earned by the fishermen on the perch harvested while under the protection of the erroneous injunction.

III. Whether the trial court erred in failing to apportion damages between the fishermen.

## DISCUSSION AND DECISION

ISSUE I: *Destruction of Sport Fish*

The DNR contends that the trial court's award of damages for the protected sport fish incidentally caught in gill nets utilized by the fishermen during the period of the erroneous injunction was inadequate. This court recently explained that appeals predicated upon a claim that an award of damages was insufficient is governed by a strict standard of review. A verdict will be reversed only when it is apparent from a review of the evidence concerning the injuries that the amount of damages assessed is so small as to indicate that it was based upon prejudice, passion, partiality, corruption, or some other improper element. *Persinger v. Lucas* (1987), Ind.App., 512 N.E.2d 865; *Baker v. Champion Motor Home Co., Inc.* (1987), Ind.App., 505 N.E.2d 144.

Generally speaking, damages for total destruction to personal property are measured by the fair market value of the property at the time of loss. *Campins v. Capels* (1984), Ind.App., 461 N.E.2d 712; *Bottoms v. B & M Coal* (1980), Ind.App., 405 N.E.2d 82; *Ross v. Felter* (1919), 71 Ind.App. 58, 123 N.E. 20. This rule is the same when determining the measure of damages for the loss or destruction of ani-

mals. The measure of damages for the loss of an animal is its value at the time of loss. *Toledo & Wabash Railway v. Smith* (1865), 25 Ind. 288; *Anthony v. Gilbert* (1837), 4 Blackford 348; *Moorman Mfg. Co. v. Barker* (1942), 110 Ind.App. 648, 40 N.E.2d 348. A problem arises, however, where, as here, there exists no market value for the property destroyed.[1]

When confronted with this dilemma, the trial court determined to assess damages on the basis of the actual hatchery production costs of producing a 3½ inch fingerling fish, permitting an allowance for a 50% mortality rate between the time of stocking and the time of the incidental catch. We applaud the trial court for its insight into providing for a 50% mortality rate when assigning a value for the various species of sport fish destroyed in the gill nets during the period of the erroneous injunction. This test, however, fails to take into consideration at least one important factor: the loss of development time. The DNR documented and the fishermen do not dispute that the various species of fish caught and destroyed in gill nets ranged from 10 to 14 inches in length, the vast majority of which were chinook salmon. These fish were the survivors of the 1986 spring stocking program and had gained a few months of maturity. Had they not been destroyed, fish of this size would have survived to spawning and produced a succeeding generation. They are unique and irreplaceable until the following spring and represent a year lost to the stocking program. Assessing damages solely on the basis of replacement costs of the 3½ inch fish simply does not adequately account for the value of the 10 to 14 inch fish destroyed in the gill nets.

Recognizing that the 10 to 14 inch fish had a value beyond that contemplated by the replacement costs of 3½ inch fingerlings is wholly consistent with prior decisions regarding the proper measure of damages for the destruction of personal property. For example, in *Ross, supra,* the

appellant was temporarily enjoined from cutting, harvesting, and disposing of wheat which he raised on a farm which he occupied as a tenant. After judgment was entered in his favor reversing the injunction, the appellant filed an action to recover the damages for the wheat taken under the injunction. Following a trial on the issue of damages, the trial court instructed the jury that if they found for the appellant, he was permitted to recover the fair market value of the wheat when taken. Had the trial court's theory of damages been embraced in *Ross,* the measure of damages there would have been the replacement costs for the wheat: the value of a sack of seed. Rather, the measure of damages was the full value of the wheat harvest. The DNR's interest in the value of the fish destroyed in the gill nets is analogous to the farmer's interest in the value of his severed wheat crop. Permitting recovery for the full value of the wheat harvest takes into consideration that the harvested wheat had a value beyond the seeds which were the genesis of the wheat crop. It takes into account the several months of growth and development between the time the seeds were planted and the time they matured into a wheat crop ready for harvest. Due to the elapsed time, the wheat had a distinct and greater value than that represented by the cost of seeds which produced it.

Assigning a value for the 10 to 14 inch sport fish still remains a difficult proposition, however. Of course there existed a readily ascertainable market for wheat where, as mentioned earlier, no such commercial market existed for the sport fish destroyed here. Nevertheless, we believe AFS Publication No. 13 and the values assigned to the sport fish pursuant to the Michigan contract submitted by fishermen Bucy and Mayoch provide relevant evidence upon which the trial court could establish a value for the destroyed sport fish.[2] The fishermen argue, however, that

---

1. There exists no fair market value upon which to base a computation of damages because it is illegal in Indiana to sell the various species of sport fish destroyed here.

2. Our holding is also in accord with other jurisdictions which have had occasion to determine the value of an animal for which there exists no commercial market. *See Park v. Moorman* (1952), 121 Utah 339, 241 P.2d 914. (Measure of

the values for the fish set forth in AFS Publication No. 13 are based in part on feeding costs in raising the fish entirely in a hatchery until the 10 to 14 inch size is realized. They contend the State does not incur such feeding costs beyond the time the fish are released for stocking at 3½ inches long. Although the State does not per se feed the fish after they are released for stocking, it does invest a considerable amount of time, money, and effort protecting the integrity of the environment in and around the Indiana waters of Lake Michigan. It is in these waters that the fish feed, live, and reproduce. Thus, in at least an indirect manner, the State incurs significant costs to feed the fish. This is not dissimilar to the farmer who rotates his crops and takes other protective measures to insure fertile ground in which to raise a healthy crop. Thus, the lack of direct feeding costs is not a relevant ground upon which to distinguish AFS Publication No. 13 and preclude its consideration in calculating the value of the sport fish caught and destroyed during the period of the erroneous injunction.[3]

ISSUE II: *Perch*

█ We must next determine whether the trial court erred in granting summary judgment on the perch profit element of damages sought by the DNR. In granting the fishermen's motion for partial summary judgment, the trial court stated that profits earned from the catch of perch were not an element of damages recoverable by the DNR for having been wrongfully enjoined. We disagree.

In support of their position, the fishermen argue that they utilized gill nets under the authority of a valid injunction which was issued after notice and a hearing by a court of competent jurisdiction, and thus the perch caught during the injunction period cannot constitute a basis for damages. This contention is without merit. It has long been established that a party wrong-

fully enjoined is entitled to all damages he suffers under the injunction regardless of whether the injunction was legally instituted. *Howard D. Johnson Co. v. Parkside Development Corp.* (1976), 169 Ind.App. 379, 348 N.E.2d 656. Recognizing this right, our supreme court requires the posting of sufficient surety to insure the recovery of damages sustained by a party subsequently determined to have been wrongfully enjoined. Ind. Rules of Procedure, Trial Rule 65(C). That rule provides in pertinent part that "[n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." The fishermen accepted the risk that the preliminary injunction would be reversed, subjecting them to liability, when they proceeded to fish with gill nets during the prohibited period.

The fishermen argue further their exposure under T.R. 65(C) is limited to damages which flow directly and as an immediate consequence of the injunction. They point out that the DNR's emergency rule only banned the use of gill nets, not all commercial fishing. Thus, they assert the imposition of damages for perch go beyond the loss suffered by the DNR.

We observe that the fishermen have no constitutional or statutory right to the fish in the Indiana waters of Lake Michigan. Rather, fishermen can fish in Lake Michigan only by virtue of annual licenses bestowed by the DNR. *Ridenour v. Furness, supra.* There is indication that the commercial fishermen could have caught some perch through the use of alternative fishing methods. Thus, the damages recoverable by the DNR would be the difference in profits the fishermen received for the perch harvested with the use of gill nets and the profits the fishermen would

damages for laying hens above the age of five months for which there existed no readily ascertainable market value computed by interpolating from value of similar but younger five-month pullets sometimes available on the market.)

**3.** This is not to suggest, however, that the cost of the ecological protection of the fish habitat is a measurable element of damage or that such may be computed as a portion of the DNR's recoverable damages.

receive for the perch harvested using alternative fishing methods and technology. The fishermen would be entitled to diminish the amount of damages recoverable by the DNR, however, only if they come forward with information that they would have legitimately captured some perch through the use of equipment other than the gill nets and of the profits they would have derived therefrom. Absent such evidence, it would not be unreasonable to allow the DNR to recover all the profits the fishermen obtained from the sale of perch harvested while under the protection of the erroneous injunction. *See Riverside Insurance Co. v. Pedigo* (1982), Ind.App., 430 N.E.2d 796.

ISSUE III: *Apportionment*

■ Fishermen Bucy and Mayoch additionally claim the trial court erred in failing to apportion between the fishermen the damages incurred by the DNR as a result of the erroneous injunction.

■ Apportionment is appropriate where there exists a reasonable basis upon which to determine the harm caused by multiple co-defendants. *Louisville & Southern Indiana Traction Co. v. Jennings* (1919), 73 Ind.App. 69, 123 N.E. 835. The State suggests, however, that each defendant herein was a direct cause of the issuance of the erroneous injunction and should be held jointly and severally liable for the damages resulting thereunder. This argument fails to perceive that the damages incurred by the DNR were not caused by the imposition of the injunction, but were the result of fishermen utilizing gill nets in violation of the ban ultimately upheld by our supreme court. The independent and concurring acts of each fishermen that caught fish with gill nets during the prohibited period caused separate and distinct damages. The DNR would not have incurred any damage if the fishermen had not utilized gill nets during the period of the ban. A review of the record further reveals that the damages caused by each defendant can be ascertained without difficulty. The trial

court erred in failing to apportion the award of damages between the fishermen.

Accordingly, this cause is reversed and remanded to the trial court for proceedings consistent with this opinion.

RATLIFF, C.J., and SULLIVAN, J., concur.