

**FILED**

May 25 2017, 10:30 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Cara Schaefer Wieneke
Wieneke Law Office, LLC
Brooklyn, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Larry D. Allen
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Caleb Sullivan, | May 25, 2017 |
| *Appellant-Defendant,* | Court of Appeals Case No. 52A02-1610-CR-2499 |
| v. | Appeal from the Miami Circuit Court |
| State of Indiana, | The Honorable Timothy P. Spahr, Judge |
| *Appellee-Plaintiff* | Trial Court Cause No. 52C01-1509-F2-35 |

**Baker, Judge.**

[1] Caleb Sullivan appeals his convictions for Level 4 Felony Burglary,[1] Level 6 Felony Conspiracy to Commit Dealing in a Controlled Substance,[2] and Level 6 Felony Theft.[3] Sullivan raises two arguments: (1) there is insufficient evidence supporting his convictions for burglary and theft; and (2) his convictions for conspiracy to commit dealing in a controlled substance and theft are barred by the prohibition against double jeopardy. Finding sufficient evidence and no double jeopardy violation, we affirm.

## Facts

[2] On the night of September 23, 2015, Sullivan was staying in Peru with his friend, Wally Taylor, and Taylor's girlfriend, Jennifer Rairigh. Sullivan and Taylor were regular drug users and wanted to get high. Sullivan brought up the idea of robbing a nursing home where he used to work. Sullivan knew how to gain access to the nursing home and knew that there were narcotics inside. Sullivan and Taylor agreed to steal narcotics from the nursing facility and then sell those drugs for money to buy heroin.

[3] Around 1:00 a.m. on September 24, 2015, Taylor and Sullivan took Rairigh's minivan and drove to the Aperion Health Care nursing home facility. Sullivan

---

[1] Ind. Code § 35-43-2-1.

[2] I.C. 35-43-4-2(a)(1). This statute was amended in the most recent legislative session. The amendments are not relevant to this case, but we cite to the version of the statute that was in effect at the time Sullivan committed the offense.

[3] Ind. Code § 35-41-5-2.

exited the van to see who was working that night; when he returned, he told Taylor that his old boss, Doreen Brunner, was on duty. Sullivan donned a mask and blue surgical gloves, took a black BB-gun from the minivan, and entered the Aperion facility from the side entrance. Taylor waited in the minivan in the parking lot.

[4] Inside, Brunner looked up and saw a masked man approach the nurse's station in the common dining room area. Sullivan appeared to be holding a gun at his waist and ordered Brunner to "open the box." Tr. Vol. II p. 150-51. He flipped open a drawer on the cart where the narcotics were stored and told Brunner, "Hurry up. I'm not playing." *Id.* at 151. Brunner noticed that Sullivan was trying to disguise his voice. She unlocked the box and placed blister packs of narcotics into a bag that Sullivan handed her. Sullivan then asked for the code he could use to exit the facility, which she provided.[4] Sullivan ran to the door, punched in the code, and exited the building.

[5] Brunner immediately called 911. Although Sullivan had been wearing a mask, Brunner recognized him from his gait and general body build. She also believed it was him because he knew the security code to enter the facility, knew that he needed a different code to exit the facility, and knew where the narcotics box was located.

---

[4] The code to exit the facility is changed frequently to ensure that residents are not able to make unauthorized exits from the building.

[6] Following the burglary, Sullivan returned to the minivan, which Taylor drove back to Rairigh's home. Rairigh was angry because she had been trying to contact Taylor and he had not responded, so she refused to let the men inside the house. Sullivan and Taylor walked to an abandoned house a couple of blocks away, where they removed the medication from the blister packs. In total, Sullivan had taken 642 pills of controlled substances, including Vicodin, Xanax, Percocet, Ultram, and Ambien. Sullivan and Taylor each took half of the pills. After they parted ways, Taylor sold sixty to seventy of the pills for a total of $400, or about $5 apiece.

[7] Police eventually found and arrested Sullivan. On September 30, 2015, the State charged Sullivan with multiple offenses. After a later amendment, Sullivan was ultimately charged with the following crimes: Level 4 felony burglary, Level 5 felony robbery, Level 6 felony residential entry, Level 6 felony conspiracy to commit dealing in a controlled substance, Level 6 felony theft, and Class A misdemeanor possession of a controlled substance.

[8] On August 31, 2016, following a trial, a jury found Sullivan guilty as charged. The trial court vacated the residential entry conviction to avoid double jeopardy concerns. On September 30, 2016, following a sentencing hearing, the trial court sentenced Sullivan to the following concurrent terms: eight years, with two years suspended to probation, for Level 4 felony burglary; eight years, with two years suspended to probation, for Level 5 felony robbery; one year and 182 days for Level 6 felony conspiracy; one year and 182 days for Level 6 felony

theft; and one year for Class A misdemeanor possession of a controlled substance. Sullivan now appeals.

# Discussion and Decision

## I. Sufficiency

[9] Sullivan argues that the evidence is insufficient to support his convictions for burglary and theft. When reviewing a claim of insufficient evidence, we will consider only the evidence and reasonable inferences that support the conviction. *Gray v. State*, 957 N.E.2d 171, 174 (Ind. 2011). We will affirm if, based on the evidence and inferences, a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Bailey v. State*, 907 N.E.2d 1003, 1005 (Ind. 2009).

## A. Burglary

[10] To convict Sullivan of Level 4 felony burglary, the State was required to prove beyond a reasonable doubt that he broke and entered a building or structure that is a dwelling of another person with the intent to commit a felony or theft in it. I.C. § 35-43-2-1(1). Sullivan argues that there is insufficient evidence establishing that the common dining room area of the nursing home is a dwelling. "Dwelling" is defined as "a building, structure, or other enclosed space, permanent or temporary, movable or fixed, that is a person's home or place of lodging." Ind. Code § 35-31-5.2-107.

[11]  The legislature has imposed an increased penalty for burglarizing a dwelling "because of the potential danger to the probable occupants" of the dwelling. *Howell v. State*, 53 N.E.3d 546, 549 (Ind. Ct. App. 2016), *trans. denied*. Here, there were at least twenty-two residents present in their rooms near the common dining area where the burglary occurred. In fact, the residents' rooms were so close to the area that Brunner worried that one of them might awaken during the burglary and be in danger, which is the very harm the legislature sought to prevent.

[12]  Sullivan directs our attention to *Robertson v. State*, 765 N.E.2d 138 (Ind. 2002), in support of his argument. In *Robertson*, our Supreme Court interpreted the statute prohibiting the unlicensed possession of a handgun outside of one's dwelling. In that case, the defendant had been convicted of that crime when he walked into the common hallway area of his apartment building while carrying an unlicensed handgun. Our Supreme Court ultimately concluded "that 'dwelling' does not include the common areas serving a person's apartment" because "the legislature cannot have intended to permit the carrying of unlicensed handguns in all apartment common areas that a person may claim as part of their place of lodging." *Id.* at 139-40.

[13]  Sullivan argues that the common dining area in the nursing home facility is analogous to the common hallway area in the apartment building in *Robertson*. We disagree. While the nursing home facility contains private rooms that house one or two residents, those rooms do not constitute the entirety of the residents' living area. The residents eat all their meals and do all their activities

in the dining room area; Brunner testified that "[e]verything they do is out there" and agreed that the area is "part of their living quarters[.]" Tr. p. 160.

[14] We question the applicability of the *Robertson* holding to the definition of "dwelling" in the context of the burglary statute, but we leave that question for another day, as we find this nursing home easily distinguishable from an apartment building. Here, it is apparent that the common dining area is a part of the residents' daily lives. They "dwell" in that area as much as they "dwell" in their private rooms. Consequently, we find sufficient evidence supporting the jury's conclusion that the nursing home constitutes a dwelling and Sullivan's conviction for Level 4 burglary.

## B. Theft

[15] To convict Sullivan of Level 6 felony theft, the State was required to prove beyond a reasonable doubt that he knowingly or intentionally exerted unauthorized control over the nursing home's medication, which had a fair market value of at least $750, with the intent to deprive the nursing home of any part of the medication's value or use. I.C.§ 35-43-4-2. Sullivan argues that there is insufficient evidence establishing the value of the medication.

[16] At trial, Taylor testified that the two men divided up the 642 stolen pills. Taylor sold sixty to seventy pills out of his share for a total of approximately $400. He testified that the pills were worth about $5 each. Consequently, the total value of all the stolen pills would exceed $3,000.

[17] Sullivan argues that evidence of the black market value of the pills is improper. Instead, Sullivan contends that the State should have introduced evidence of the value of the pills in the commercial market—*i.e.*, pharmacy value. Sullivan notes that "[t]he issue of whether the black market value of controlled substances can be used for purposes of proving felony theft has not been addressed in Indiana." Appellant's Br. p. 11.

[18] In support of his argument, Sullivan directs our attention to *Ridenour v. Furness*, 546 N.E.2d 322 (Ind. Ct. App. 1989), in which this Court reviewed the computation of damages for the illegal trapping of protected sport fish by commercial fishermen in Lake Michigan. Damages were to be calculated by measuring the "fair market value of the property at the time of loss." *Id.* at 325. In that case, however, there was no fair market value "because it is illegal in Indiana to sell the various species of sport fish destroyed here." *Id.* at 325 n.1. According to Sullivan, this aside in *Ridenour* establishes that the black market value of property cannot be used to establish the property's fair market value.

[19] The *Ridenour* Court observed that although there was no commercial market for the fish, the value of the fish could be calculated by looking at a number of other factors. *Id.* at 326-27 (examining, among other things, actual hatchery production costs, mortality rate of the fish, size of the fish, cost of feeding the fish, etc.). We see nothing in *Ridenour*—or any other relevant caselaw—that would require a factfinder to value an item based only on the commercial market value, even where that value is readily ascertainable.

[20] This Court has explained that "[t]he fair market value is 'the price at which property would change hands between a willing buyer and seller, neither being under any compulsion to consummate the sale.'" *Pitcavage v. Pitcavage*, 11 N.E.3d 547, 564 (Ind. Ct. App. 2014) (quoting *City of Carmel v. Leeper Elec. Servs., Inc.*, 805 N.E.2d 389, 395 (Ind. Ct. App. 2004)). In this case, the State presented evidence that willing buyers paid $5 per pill. We see no reason to question this evidence simply because it is evidence of the black market value. Therefore, we find the evidence sufficient to support Sullivan's theft conviction.

## II. Double Jeopardy

[21] Finally, Sullivan argues that his convictions for conspiracy to commit dealing in a controlled substance and theft violate the prohibition against double jeopardy. The Indiana Constitution provides that "[n]o person shall be put in jeopardy twice for the same offense." Ind. Constitution, Art. I, § 14. Two or more offenses are the "same offense" if the essential elements of one offense establish the essential elements of another offense with respect to either the statutory elements or the actual evidence used to convict. *Richardson v. State*, 717 N.E.2d 32, 49 (Ind. 1999). We apply a de novo standard of review to double jeopardy claims. *Rexroat v. State*, 966 N.E.2d 165, 168 (Ind. Ct. App. 2012).

[22] Sullivan argues that these two convictions violate the actual evidence test of our prohibition against double jeopardy. As long as each conviction requires proof of at least one unique evidentiary fact, the convictions are not barred by double jeopardy. *Bald v. State*, 766 N.E.2d 1170, 1172 (Ind. 2002).

[23] To convict Sullivan of conspiracy, the State was required to prove that he and Taylor agreed to commit the crime of dealing in a controlled substance and that Sullivan and/or Taylor committed an overt act in furtherance of the agreement. I.C. § 35-41-5-2. The crime of conspiracy is complete upon the agreement and the performance of the overt act. *E.g.*, *M.T.V. v. State*, 66 N.E.3d 960, 965 (Ind. Ct. App. 2016), *trans. denied*. Initially, we note that Sullivan and Taylor agreed to go to the nursing home facility to steal the narcotics pills and then to sell those pills. They completed any number of actions that could be considered overt acts in furtherance of that agreement: they borrowed the minivan, they drove to the nursing home facility, Sullivan left the vehicle to see which employee was on duty and then returned, Sullivan put on a mask and gloves, Sullivan retrieved a BB-gun, and Sullivan entered the entry code into the keypad and entered the building. The conspiracy was complete as soon as any one of these overt acts was performed.

[24] We must look, however, at how the jury was instructed to consider the evidence. In this case, the final jury instruction informed the jury that to convict Sullivan of conspiracy, it must find that either Sullivan or Taylor "commit[ed] the act of theft" at the nursing home facility. Appellant's Supp. App. Vol. II p. 11.

[25] At first glance, it seems as though the way in which the State tried this case has led to a double jeopardy violation, because the State needed to prove that Sullivan committed the theft to prove that he performed the overt act. In this case, however, the State charged the theft offense as a Level 6 felony, meaning

that, to prove that this offense occurred, it needed to take the additional step of proving that the stolen property valued at least $750—evidence that is not needed to establish the overt act element of the conspiracy charge. Because this constitutes a distinct piece of evidence that was wholly separate from the conspiracy charge, and the conspiracy charge required proof of the agreement between Taylor and Sullivan, the actual evidence used to support these two convictions was not the same. Consequently, there is no double jeopardy violation.

[26] The judgment of the trial court is affirmed.

Barnes, J., and Crone, J., concur.