**OLCOTT INTERNATIONAL & CO., INC., Appellant–Cross–Appellee,**

v.

**MICRO DATA BASE SYSTEMS, INC., Appellee–Cross–Appellant.**

No. 79A05–0211–CV–544.

Court of Appeals of Indiana.

Aug. 19, 2003.

David Feinsilver, The Feinsilver Law Group, P.C., Millburn, NJ, Jacqueline Chosnek, Pearlman Chosnek & Hopson, P.C., Lafayette, IN, Attorney for Appellant.

William P. Kealey, Elizabeth B. Searle, Stuart & Branigin, LLP, Lafayette, IN, Attorney for Appellee.

## OPINION

BARNES, Judge.

### Case Summary

Olcott International ("Olcott") appeals the trial court's entry of judgment in favor of Micro Data Base Systems ("MDBS") in MDBS' breach of contract action. MDBS raises several cross-appeal issues. We affirm in part, reverse in part, and remand.

### Issues

■ We consolidate and restate the issues before us, including MDBS' cross-appeal issues, as:

I. whether some or all of MDBS' breach of contract claims are barred by the applicable statute of limitations;

II. whether the trial court erred in calculating MDBS' damages;

III. whether the trial court erred in its calculation of pre- and post-judgment interest; and

IV. whether the trial court awarded an unreasonable amount of attorney fees to MDBS.[1]

### Facts

MDBS is a software company that develops database management modules, or components, that software application developers, such as Olcott, integrate into their own database programs for distribution to third parties. Olcott created a database management program for its clients for the purpose of tracking patents and trademarks that it called Olcott Intellectual Property Management System II ("OIPMS II"), which utilized MDBS modules. The MDBS modules at issue in this

---

1. We will not address Olcott's argument that the trial court made erroneous evidentiary rulings. It fails to present any cogent analysis on this issue and fails to cite any pertinent authority, most notably the Indiana Rules of Evidence and how the trial court's rulings ran afoul of them. Likewise, Olcott fails to provide any cogent analysis with respect to its claim that the trial court "should have fashioned a remedy" on its counterclaim alleging fraud by MDBS. Appellant's Br. p. 40. Olcott fails to specify what such a remedy would be, nor does it list the elements of fraud and explain how MDBS' alleged bad faith conduct satisfied them. Olcott's failure to make cogent arguments and cite relevant authority waives these issues for our review. *See* Ind. Appellate Rule 46(A)(8)(a); *Loomis v. Ameritech Corp.,* 764 N.E.2d 658, 668 (Ind.Ct.App. 2002), *trans. denied.*

case are data management system modules ("DMS"), report and transaction logging modules ("RTL"), query and reporting system modules ("QRS"), interactive data manipulation language modules ("IDML"), and database restructuring system modules ("DBRS"). All of these modules were available in either single-user ("SU") or multi-user ("MU") versions, with the latter also referred to as a local area network ("LAN") version.

In 1984, MDBS and Olcott executed a software licensing agreement pursuant to which Olcott was granted permission to utilize MDBS version III software modules in its own software applications. This contract did not specify whether the license was for SU or MU versions of the modules. Olcott agreed to pay royalties to MDBS for each copy of each MDBS module included in an Olcott program distributed to third parties. To track Olcott's distributions and ensure that MDBS received its royalties, the contract required Olcott to pre-purchase "tokens" from MDBS, which were similar to postage stamps; these tokens were to be placed on each copy of Olcott software that it distributed to its customers, corresponding with the number and types of MDBS modules included in the program. For example, an Olcott program that included MDBS' DMS, QRS, RTL, IDML, and DBRS modules was supposed to have five tokens affixed to it, corresponding to each type of module, before it was distributed to Olcott's customer.[2] The 1984 contract provided as a remedy to MDBS in the event of Olcott's breach, "three times the then current license fee for the corresponding components involved, per occurrence of violation...." Appellee's App. p. 5. The contract also granted MDBS the right to inspect Olcott's records to monitor

its compliance with the contract and obligated Olcott to maintain records of its software distributions for up to five years after the contract's termination.

In 1988, the parties executed a second contract that specifically referred to the MDBS III LAN system. This contract retained the token system for paying royalties. It was not as detailed as the 1984 contract as to Olcott's record-keeping requirements, but it still required Olcott to maintain and make records available for inspection and "to provide reasonable assistance to mdbs in enforcing mdbs' rights to the System." App. p. 1144. Additionally, the 1988 contract omitted the treble damages provision found in the 1984 contract.

Until 1995, MDBS had an affirmative business policy of not attempting to ascertain whether Olcott or any of its other licensees were in full compliance with their licensing contracts with MDBS, for fear of alienating the licensees. However, MDBS began then attempting to audit and inspect the records of its licensees. On November 11, 1996, MDBS made its first request for information from Olcott regarding its distribution of MDBS modules. For nearly three years, Olcott refused to provide any information to MDBS. Finally, on June 22, 1999, Olcott sent a fifty-pound box to MDBS that purportedly contained all of Olcott's records relating to MDBS.

On August 2, 1999, MDBS sued Olcott for breach of contract and for an accounting. It was eventually ascertained and agreed to by both parties that Olcott distributed at least forty-five copies of its OIPMS II system containing MDBS modules between 1984 and 1995, some as SU versions and others as MU versions; there was a dispute as to whether Olcott distrib-

---

**2.** Olcott claims that it was impossible to physically affix tokens in many cases because it

often electronically transmitted programs to its customers.

uted software containing MDBS modules to Westinghouse in 1988, with whom Olcott worked but who also had its own direct licensing agreement with MDBS. MDBS sought to collect damages for breach of contract for every time Olcott distributed a MDBS module without physically affixing a corresponding token to the OIPMS II software product delivered to Olcott's customers. It alleged a total principal damages amount of $438,850, consisting of forty-six tokenless IDML SU and DBRS SU distributions, thirty-five tokenless QRS SU distributions, thirty-six tokenless RTL SU distributions, thirty-seven tokenless DMS SU distributions, ten tokenless DBRS MU distributions, and nine tokenless distributions each of DMS MU, RTL MU, QRS MU, and IDML MU. MDBS applied the module prices in effect for 1995 for all of the distributions, and multiplied the price times three for the SU distributions in accordance with the 1984 contract.

As its first line of defense, Olcott argued that MDBS' breach of contract claims were barred by the statute of limitations or by the doctrine of laches. Olcott's motion for summary judgment on this basis was denied. Alternatively, Olcott calculated MDBS' damages very differently, arriving at a total sum of $14,550. It admitted that it failed to physically affix MDBS tokens to every copy of OIPMS II software it distributed, as required by the parties' contracts. However, it claimed to be entitled to credit for tokens that it had purchased or otherwise received from MDBS, but which were not physically affixed to outgoing software programs. Olcott also claimed that the QRS and IDML modules were not essential to the OIPMS II program and that it therefore owed no royalties for those modules; that the DBRS module was not present in the soft-

ware at all; that the proper method of calculating the royalties Olcott owed was the module price at the time a particular distribution occurred, not the much-inflated price in 1995; [3] and that the treble damages clause in the 1984 contract was unenforceable.

A bench trial was first held on January 16–18, 2002. Unfortunately, the judge who presided over that trial died shortly thereafter, before entering judgment. Olcott moved for and was granted a mistrial, and a second bench trial was held on June 19–21, 2002. On August 21, 2002, the trial court entered judgment, with accompanying findings and conclusions, in favor of MDBS in the principal amount of $83,295. It again rejected Olcott's statute of limitations defense. It also found that thirty-four SU OIPMS II sales occurred between 1984 and 1992, two SU OIPMS II sales occurred in 1995, and ten MU OIPMS II sales (including the sale to Westinghouse) occurred between 1988 and 1990. It required Olcott to pay royalties for every tokenless distribution of a MDBS module, regardless of whether Olcott had actually paid for or otherwise received a token but merely failed to affix it. It also enforced the treble damages provision with respect to the SU distributions and found that Olcott was required to pay for the QRS and IDML modules. It also found, however, that the OIPMS II program did not contain the DBRS module, and in calculating damages it applied the price for each module in effect on the date each improper distribution occurred, not the 1995 price list for every distribution. The trial court awarded pre-judgment interest to MDBS, but only dating from the filing of the lawsuit in 1999. Finally, it awarded attorney fees and costs to MDBS in the full amount it requested, $159,567.14. The trial court's

---

**3.** The 1995 price list increased the cost of MDBS modules 350 to 400 percent, after the ten previous years had seen a total price increase of ten percent.

award of post-judgment interest only expressly applied to the damages award, not the attorney fees award. Olcott now appeals, and MDBS cross-appeals.

### Analysis

■■■ The trial court here entered findings of fact and conclusions thereon sua sponte. In such a case, we apply the following two-tier standard of review: whether the evidence supports the findings, and whether the findings support the judgment. *Learman v. Auto Owners Ins. Co.*, 769 N.E.2d 1171, 1174 (Ind.Ct.App. 2002), *trans. denied.* Findings and conclusions will be set aside only if they are clearly erroneous, that is, when the record contains no facts or inferences supporting them. *Id.* "A judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made." *Id.* We consider only the evidence favorable to the judgment and all reasonable inferences flowing therefrom, and we will neither reweigh the evidence nor assess witness credibility. *Klotz v. Klotz,* 747 N.E.2d 1187, 1190 (Ind.Ct.App. 2001). Sua sponte findings control only as to the issues they cover, and a general judgment standard of review controls as to the issues upon which there are no findings. *Learman,* 769 N.E.2d at 1174. A general judgment will be affirmed if it can be sustained on any legal theory supported by the evidence. *Id.*

### I. Statute of Limitations

We first address Olcott's argument that the statute of limitations barred MDBS from bringing a cause of action for breaches of contract that occurred many years before MDBS filed suit on August 2, 1999. MDBS claimed damages for each purported instance in which Olcott breached the 1984 and/or 1988 contracts by distributing copies of MDBS software modules without physically affixing a pre-paid "token" to the OIPMS II software program distributed to Olcott's customers. Both parties' evidence establishes that the earliest of these distributions occurred on November 12, 1984, and the latest occurred on April 1, 1995.

■■ Neither party devotes any effort arguing as to the appropriate statute of limitations to apply in this case. Olcott asserts in a footnote in its brief that the appropriate statute is Indiana Code Section 26–1–2–725, which establishes a four-year statute of limitations for breaches of contract involving the sale of "goods" under Article 2 of the Uniform Commercial Code ("UCC"). MDBS does not refute this claim, and our review of available Indiana precedent indicates that this is indeed the correct statute of limitations for this case. This court has held that a contract for the development of a software program to meet a customer's specific needs is a contract for services, not goods, and does not fall under Article 2 of the UCC. *Data Processing Services, Inc. v. L.H. Smith Oil Corp.,* 492 N.E.2d 314, 318–19 (Ind.Ct.App.1986). In so holding, however, we also noted that such a contract is unlike a contract for the purchase of "generally-available standardized software," which other jurisdictions have held to constitute a sale of goods. *Id.* at 319. Here, Olcott contracted to purchase pre-existing, standardized software modules from MDBS, which were not created especially for Olcott. Therefore, consistent with *Data Processing Services,* the contracts at issue here were ones for the sale of goods, not services, and Article 2 of the UCC applies.[4] Thus, unless the statute of

---

4. We observe that *Data Processing Services* has been overruled to the extent it advocated

a "bifurcated" approach to whether a contract is for the sale of goods or services,

limitations was tolled at some point, every one of MDBS' breach of contract claims is time-barred because it filed suit more than four years after the last purported breach.

MDBS correctly observes that Section 26–1–2–725(4) specifically provides that it does not alter generally applicable laws governing the tolling of statutes of limitations. In that regard, MDBS directs us to Indiana Code Section 34–11–5–1, which states, "If a person liable to an action conceals the fact from the knowledge of the person entitled to bring the action, the action may be brought at any time within the period of limitation after the discovery of the cause of action." MDBS claims that Olcott's failure to disclose its breaches of contract to MDBS, combined with its failure to maintain adequate records regarding software distributions and its refusal to cooperate with MDBS beginning in 1996, served to toll the four-year statute of limitations for every one of Olcott's alleged breaches of contract dating back to 1984.

 The concealment tolling statute was first enacted in 1881 and, therefore, there is a significant amount of case law interpreting it. The law narrowly defines concealment, and generally the concealment must be active and intentional. *Ludwig v. Ford Motor Co.,* 510 N.E.2d 691, 697 (Ind.Ct.App.1987), *trans. denied* (1988). "The affirmative acts of concealment must be calculated to mislead and hinder a plaintiff from obtaining informa-

tion by the use of ordinary diligence, or to prevent inquiry or elude investigation." *Id.* "There must be some trick or contrivance intended by the defrauder to exclude suspicion and prevent inquiry." *Id.* Mere lack of knowledge of a cause of action is not enough to constitute concealment and toll the running of the statute. *Id.* A plaintiff bears the burden of proving that a statute of limitations should be tolled, which includes demonstrating the use of reasonable care and diligence to detect the alleged cause of action.[5] *See Lambert v. Stark,* 484 N.E.2d 630, 632 (Ind.Ct.App. 1985), *trans. denied* (1986).

 MDBS cites cases for the proposition that "concealment" of a cause of action under the tolling statute need not be affirmative and active and may be satisfied by mere silence, "[w]here a defendant has a duty to disclose material information...." Appellee's Br. p. 34. It claims this duty on Olcott's part arose out its contracts with MDBS. MDBS, however, fails to acknowledge language in the cases it cites and numerous other Indiana cases that is fatal to most of its tolling claims: to toll the statute of limitations, a defendant's concealment of a cause of action must be active and intentional *unless* the parties are in a *fiduciary* relationship[6] that imposes a duty to disclose, in which case mere silence may be sufficient to toll the limitations period. *See Malachowski v.*

---

instead of a "predominant thrust" approach. *Insul–Mark Midwest v. Modern Materials,* 612 N.E.2d 550 (Ind.1993). This does not lower *Data Processing Services'* precedential value for this case, however, because we held the contract was one for services, not goods, under either approach.

**5.** Additionally, Indiana Code Section 26–1–2–725(2) expressly provides, "A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach." Clearly, the UCC places a burden

on parties to monitor the performance of contracts or risk losing the right to sue for their breach.

**6.** The term "confidential relationship" is also used, although this term appears to be interchangeable with "fiduciary relationship." *See Epperly v. Johnson,* 734 N.E.2d 1066, 1074 (Ind.Ct.App.2000); *see also* Black's Law Dictionary 294 (7th ed.1999) (for definition of "confidential relationship," "See FIDUCIARY RELATIONSHIP").

*Bank One, Indianapolis,* 590 N.E.2d 559, 563 (Ind.1992) (addressing trustee-beneficiary relationship); *see also, e.g., Guy v. Schuldt,* 236 Ind. 101, 109, 138 N.E.2d 891, 895 (1956); *Ludwig,* 510 N.E.2d at 697; *Lambert,* 484 N.E.2d at 632; *Forth v. Forth,* 409 N.E.2d 641, 645 (Ind.Ct.App. 1980).

▮▮▮ Here, the trial court made no finding that MDBS and Olcott were in a fiduciary relationship, nor is there any evidence in the record that would support such a finding. Specifically, it has been held in the context of constructive fraud that "[c]ontractual agreements do not give rise to a fiduciary relationship creating a duty." *Morgan Asset Holding Corp. v. CoBank, ACB,* 736 N.E.2d 1268, 1273 (Ind. Ct.App.2000). When two parties are involved in an arm's length, contractual arrangement, a fiduciary relationship may not be predicated on such an arrangement. *Comfax Corp. v. North American Van Lines, Inc.,* 587 N.E.2d 118, 125–26 (Ind. Ct.App.1992); *see also French v. Hickman Moving & Storage,* 400 N.E.2d 1384, 1389 (Ind.Ct.App.1980) (holding bailor-bailee relationship was not a fiduciary or confidential one that obligated bailees to disclose their conversion of bailor's property for purposes of tolling statute). To the extent Olcott owed contractual obligations to MDBS regarding royalty payments for copies of MDBS software that it distributed to third parties, this was insufficient to give rise to any fiduciary obligations of disclosure. There is no indication of a close-knit, intertwined business relationship between Olcott and MDBS, which may give rise to a fiduciary relationship between two businesses. *See Knauf Fiber Glass, GmbH v. Stein,* 615 N.E.2d 115, 124 (Ind.Ct.App.1993), *summarily aff'd,* 622 N.E.2d 163, 166 (Ind.1993). There is no indication of a disparity in power and influence between Olcott and MDBS or that they had anything other than an arm's-length business relationship.

▮▮▮ Thus, it is clear that in order to toll the statute of limitations, it was not enough that Olcott failed to disclose its contract breaches; MDBS was required to demonstrate that Olcott actively concealed them. There is no finding by the trial court, nor evidence in the record, to suggest that Olcott did so until November 11, 1996. There are no indications that Olcott affirmatively misrepresented to MDBS its compliance with the contracts by statements, conduct, or otherwise; the most that happened is that Olcott distributed copies of MDBS software without keeping appropriate records, without paying the appropriate royalties, and without informing MDBS of these breaches of contract. Although this breached the Olcott–MDBS contracts and arguably also breached Olcott's obligation of honest dealing, this was not enough to toll the statute of limitations in the absence of any "trick or contrivance" intended to exclude suspicion and prevent inquiry by MDBS. *See French,* 400 N.E.2d at 1390 (holding bailees' breach of duty of honest dealing did not preclude them from relying on the statute of limitations). In fact, the evidence as to why MDBS delayed investigating compliance with its contracts for so many years was because it made a business decision not to do so, not because it was misled by Olcott's affirmative acts to dissuade it from conducting any investigation.

Similarly, as for "due diligence," the trial court specifically found that "[u]ntil 1995 MDBS had a practice of not exercising its contractual rights to demand the information of its customers in order to determine compliance.... MDBS made its first inquiry as to software distributions in a letter addressed to Olcott's employee, Nick Scarano on November 11, 1996." App. p. 35. Clearly, MDBS exercised no diligence

with respect to assuring that Olcott was complying with the contract until November 11, 1996. The trial court found that "MDBS made a pragmatic business decision not to exercise its auditing rights out of concern of alienating customers...." *Id.* MDBS must suffer the adverse consequences of that decision. It cannot, years later and after the statute of limitations has passed, alter its course of conduct as to what constituted a "pragmatic business decision" and now decide that it wants to vigorously enforce its contract rights. Otherwise, one of the key purposes behind statutes of limitation, to encourage the prompt presentation of claims, would be defeated. *See Havens v. Ritchey,* 582 N.E.2d 792, 794 (Ind.1991). MDBS failed to prove that it used due diligence and reasonable care to monitor its contracts with Olcott.

■■■■■■ MDBS also argues that the 1984 contract essentially extended the statute of limitations for bringing an action for its breach to anytime within five years after the contract's termination, because Olcott was contractually obligated to maintain records regarding the distribution of MDBS software for five years after the contract's termination. To the extent the 1984 contract, prepared by MDBS, can be read as extending the statute of limitations

in such a way, however, it would run directly afoul of the UCC. Indiana Code Section 26–1–2–725(1) provides that "[b]y the original agreement the parties may reduce the period of limitation to not less than one (1) year, *but may not extend it.*" (Emphasis added). The official comment to this section also clearly states, "The parties may not ... extend the statutory period." "It is a well settled rule of contract law that the parties to an agreement cannot enforce terms which contravene statutory law." *Meehan v. Meehan,* 425 N.E.2d 157, 160 (Ind.1981). Although the UCC generally allows freedom by the parties to a contract to vary the "effect" of the UCC's provisions, *see* I.C. 26–1–1–102(3), it contains no provision allowing parties to directly contradict a clear and unequivocal code section. Even if we were to conclude that the 1984 contract purported to extend the statute of limitations, we could not uphold the enforcement of such a term contravening a black-letter provision of the UCC.

■■■■ We do agree that Olcott's failure to comply with MDBS' information requests after November 11, 1996, may fairly be characterized as "stonewalling" or active and intentional concealment of its breaches of contract that would toll the statute of limitations.[7] However, MDBS

7. Even this conduct by Olcott is not a perfectly clear-cut example of active or fraudulent concealment, however. An older case decided by our supreme court addressed a factual scenario very similar in some respects to the facts in this case. *Fidelity & Casualty Co. of New York v. Jasper Furniture Co.,* 186 Ind. 566, 117 N.E. 258 (1917). In *Fidelity,* the defendant allegedly breached a contract with the plaintiff by failing to pay an additional insurance premium when due. The plaintiff sued for breach of contract after the applicable statute of limitations had run, but claimed the statute had been tolled because the defendant had repeatedly refused to allow the plaintiff to inspect its books and records in relation to the alleged breach, which refusal

was also a breach of the parties' contract. Our supreme court rejected the plaintiff's tolling argument. It held, "Appellee's refusal to permit an examination of its books may have constituted a breach of contract, but it was not a fraudulent concealment within the meaning of the law, and could not affect the running of the statute of limitations." *Id.* at 569, 117 N.E. at 259. This language would suggest that Olcott's "stonewalling" was insufficient to toll the statute of limitations. The *Fidelity* court, however, also stated, "The present action does not appear to be based on any facts which have not long been in possession of appellant...." *Id.* MDBS, however, did not know of Olcott's breaches of contract

cites no authority supporting its implied proposition that "active concealment" of a cause of action that only occurs *after* the statute of limitations has already run can resuscitate that cause of action. We are only aware of authority stating the opposite: "Acts of concealment coming after the statute has run do not remove the bar." 54 C.J.S. *Limitations of Actions* § 90 (1987). "The conduct or misrepresentation upon which a plaintiff's claim of estoppel to assert the statute of limitations is based must occur prior to the expiration of the limitation period, not after the right of action has been barred by the running of the statute." 51 Am.Jur.2d *Limitation of Actions* § 382 (2000).

As of November 11, 1996, the four-year statute of limitations had run on all but two of the improper Olcott software distributions that the trial court found to have occurred. These two distributions occurred in 1995 and involved MDBS SU modules, and are the only breaches of contract for which Olcott may be held liable. The trial court found the existence of forty-four other distributions, but the latest of these forty-four occurred on August 11, 1992, more than four years before November 11, 1996, and the earliest point at which Olcott can be said to have actively concealed its breaches of contract. MDBS' claims as to breaches of contract arising out of any of these forty-four distributions were time barred before Olcott engaged in any active concealment, and they remain time barred despite Olcott's later conduct. Except with respect to the 1995 distributions, the trial court's findings do not support its judgment that MDBS' causes of action for breach of contract were not barred by the statute of limitations.

Our resolution of this issue renders several of the parties' claims moot. We need

not address Olcott's argument that the trial court should have deducted from the damages awarded to MDBS the value of tokens that Olcott had in inventory but had not actually affixed in some way to software distributed to Olcott's customers. Assuming this argument has merit, it would not apply to the 1995 software distributions. To the extent Olcott could have received a "credit" for tokens purchased but not affixed, it would have applied to the distributions that occurred earlier in time. By the time of the 1995 distributions, any "credit" would have been used; the damages calculation of Olcott's own employee did not allow any offsetting token "credit" for the 1995 distributions. *See* Defendant's Ex. H. As for MDBS' cross-appeal, we need not address its claim that with respect to Olcott's distribution of MU software products, the trial court erroneously failed to find that such distributions necessarily included MDBS SU modules for which Olcott was required to pay royalties as well as MDBS MU modules; the 1995 distributions were of SU products. We also need not address whether the trial court was required to assess damages for pre–1995 unauthorized module distributions based on MDBS' 1995 list prices, obviously because the only non-time-barred distributions occurred in 1995. With this in mind, we now turn to the remaining issues related solely to the 1995 distributions.

## II. Calculation of Damages

Each party cites reasons why it believes the trial court's assessment of damages stemming from Olcott's 1995 breaches of contract is clearly erroneous. Olcott contends the trial court should not have concluded that it was required to pay royalties for QRS and IDML modules. MDBS disagrees and additionally contends the trial

---

because of Olcott's refusal to cooperate, and

we do not believe *Fidelity* is controlling here.

court should have required Olcott to pay royalties for the DBRS module. On these points, we conclude both parties are asking this court to reweigh the evidence.

 There was no direct evidence of precisely which MDBS modules were included within the two OIPMS II software programs Olcott distributed in 1995, or within almost all of the programs Olcott distributed since 1984. The trial court, however, found that a copy of OIPMS II SU software shipped to Pitney Bowes in 1985 was "a fair representation" of the SU software Olcott shipped to all of its customers. App. p. 37. This program contained MDBS' DMS, RTL, QRS, and IDML modules. Supporting the trial court's finding that the Pitney Bowes' software was a "fair representation" of all of Olcott's SU OIPMS II distribution is the testimony of Olcott employee Thomas Bado, who testified that he found a copy of OIPMS II on an old computer and indicated that it contained the DMS, RTL, QRS, and IDML modules. Additionally, an internal Olcott document with a copyright date of 1991 lists DMS, RTL, QRS, and IDML as known components of OIPMS II. Although Bado testified that OIPMS II could function without the QRS and IDML modules, the parties' contract required Olcott to pay royalties for all module distributions, not just for module distributions that were necessary for a software program's functioning. Thus, the trial court's finding that the two 1995 distributions of OIPMS II contained QRS and IDML modules, and that Olcott was required to pay for those distributions, is not clearly erroneous.

 As for the DBRS module, MDBS essentially contends that the 1985 Pitney Bowes distribution was not a "fair representation" of OIPMS II SU because it failed to include the DBRS module. This module was present in a copy of Westing-

house's own intellectual property management system, which was a MU program; it was not found in the Pitney Bowes SU program, nor on the program found at Olcott's offices according to Bado's testimony, nor on the OIPMS II internal document file listing with the 1991 copyright date, which document MDBS relies upon as being accurate with respect to the QRS and IDML modules. Additionally, Westinghouse had its own direct licensing agreement with MDBS. Although it also worked in conjunction with Olcott in developing an intellectual property management system, there was some confusion at trial as to the source of each of the MDBS modules found in the Westinghouse program. The evidence most favorable to the judgment clearly supports the finding that the typical OIPMS II SU program, including those distributed in 1995, did not include the DBRS module, and that Olcott accordingly was not required to pay any royalties for that module.

 Olcott also argues that the trial court erred in applying MDBS' 1995 price list, purportedly only for MDBS version IV modules, to Olcott's 1995 software distributions, which contained MDBS version III modules that Olcott claims were not covered by the 1995 version IV price list. We conclude Olcott invited any error on this point, if there was error. Specifically, the trial court utilized the same pricing for the 1995 distribution of DMS and RTL modules that Olcott itself used in its Exhibit H, which was its proposed damages calculation. These prices, $1000 for each DMS module and $725 for each RTL module, reflected the 1995 MDBS IV price list. The trial court also included QRS and IDML modules in its damages calculation and also used the 1995 MDBS IV price list for those modules, consistent with the DMS and RTL modules. By proposing to utilize the 1995 MDBS IV

price list with respect to the 1995 distributions, Olcott invited any error on this point. A party cannot invite error and then request relief on appeal based upon that ground; such an error cannot be reviewed by this court. *Beeching v. Levee,* 764 N.E.2d 669, 674 (Ind.Ct.App.2002).

 We now address whether the treble damages provision of the 1984 contract is enforceable. Initially, we observe that although the 1988 contract does not contain a parallel treble damages provision, the 1984 contract controls the 1995 SU module distributions. The 1988 contract specifically references MDBS LAN, or MU, modules, and on its face does not appear to apply to SU modules. Consequently, any distributions of SU modules were still controlled by the 1984 contract. To the extent Olcott argues on appeal that the 1988 contract entirely superseded the 1984 contract, it never raised such an argument at trial, meaning the argument is now waived. *Troxel v. Troxel,* 737 N.E.2d 745, 752 (Ind.2000).

 Contrary to Olcott's characterization, MDBS claims the 1984 contract's treble damages provision is not one for liquidated damages because it is based on a proportion of actual damages, i.e. three times the royalties due for each particular module that Olcott improperly distributed. We observe that "[a] typical liquidated damages provision provides for the forfeiture of a stated sum of money upon breach without proof of damages." *Gershin v. Demming,* 685 N.E.2d 1125, 1127 (Ind.Ct. App.1997). Under this definition, the treble damages provision is clearly a liquidated damages provision, because it allows MDBS to collect not only unpaid royalties, but also three times that amount without having to prove actual damages in that amount. Properly labeling the provision as a liquidated damages clause also resolves the dispute between Olcott and

MDBS as to the appropriate standard of review: the question whether a liquidated damages clause is valid, or whether it constitutes an unenforceable penalty, is a pure question of law for the court. *Id.* at 1128.

 "In determining whether a stipulated sum payable on a breach of contract constitutes liquidated damages or a penalty, the facts, the intention of the parties and the reasonableness of the stipulation under the circumstances of the case are all to be considered." *Id.* If the sum sought by a liquidated damages clause is grossly disproportionate to the loss that may result from a breach of contract, we should treat the sum as a penalty rather than liquidated damages. *Rogers v. Lockard,* 767 N.E.2d 982, 991 (Ind.Ct.App. 2002). "Liquidated damages provisions are generally enforceable where the nature of the agreement is such that when a breach occurs the resulting damages would be uncertain and difficult to ascertain." *Gershin,* 685 N.E.2d at 1127. However, to be enforceable the stipulated sum must fairly be allowed as compensation for the breach. *Id.* at 1127–28. Additionally, we construe any contract ambiguity against the party who drafted it. *Rogers,* 767 N.E.2d at 990. If there is uncertainty as to the meaning of a liquidated damages clause, classification as a penalty is favored. *Id.* at 992.

We hold that the treble damages provision in the 1984 contract is an unenforceable penalty. The primary damages MDBS suffered by Olcott's failure to pay royalties for its distribution of MDBS' software, or to keep proper records of the distributions, were the royalties themselves, or MDBS' lost profits, which is a relatively easily ascertainable amount. We have previously held that a damages provision for the breach of a covenant not to compete, which purported to triple the amount of any client fees earned by the breaching party stemming from a breach, was an unen-

forceable penalty. *Hahn v. Drees, Perugini & Co.*, 581 N.E.2d 457, 463 (Ind.Ct.App. 1991). MDBS attempts to minimize the precedential value of *Hahn* by noting that our decision was based in part on the fact that the damages provision applied regardless of whether the ex-employer suffered any harm from an ex-employee's breach of the covenant not to compete, a situation it claims is not present here. Even if we were to accept that argument,[8] that was not the only basis for our decision. We also unequivocally stated, "our decision in this respect *is fully supportable* upon the ground that the treble damages exacted by the covenants bear no reasonable relationship to the amount of damages incurred" in the event of a breach. *Id.* (emphasis added). Instead, the ex-employer was limited to recovering lost profits. *Id.*

■■■ MDBS should be similarly limited. To the extent MDBS claims, as a justification for the treble damages provision, that it suffered incidental damages caused by Olcott's "stonewalling" and failure to readily provide information to MDBS when it was requested, we observe that the 1984 contract also allows MDBS to recover attorney fees and collection costs associated with enforcing the agreement, and also allows the imposition of "exemplary" damages. Where a contract allows a party to pursue liquidated damages *and* other legal and equitable remedies, the purported liquidated damages clause serves as a penalty and not an estimation of actual damages. *See Rogers*, 767 N.E.2d at 992. MDBS may be made whole for Olcott's breach by recovering the royalties due, attorney fees and collection costs associated with the breach, and an appropriate amount of pre-and post-judgment interest. Any sum above this amount is a penalty

that goes beyond compensating MDBS for Olcott's breach and, as such, is unenforceable. *See id.* Additionally, any doubt as to whether the provision serves as a penalty must be resolved against MDBS as the drafter of the contract. *See id.* We therefore reverse the trial court's damages calculation to the extent it tripled the amount of royalties due for Olcott's 1995 distributions.

### III. Pre- and Post–Judgment Interest

MDBS claims on cross-appeal that the trial court erred in its calculation of pre- and post-judgment interest. As for prejudgment interest, the trial court only awarded it from the date MDBS filed its lawsuit, or August 2, 1999, "because for many years MDBS did not pursue collection." App. p. 38. Although we understand the trial court's sentiment, the proper remedy for MDBS' failure to pursue collection for many years was to conclude that most of its claims were time-barred, not to adjust the amount of pre-judgment interest awarded.

■■■ An award of pre-judgment interest in a breach of contract action is warranted if the amount of the claim rests upon a simple calculation and the terms of the contract make such a claim ascertainable. *Noble Roman's, Inc. v. Ward*, 760 N.E.2d 1132, 1140 (Ind.Ct.App.2002). "The test for determining whether an award of prejudgment interest is appropriate is whether the damages are complete and may be ascertained as of a particular time." *Id.* Importantly for purposes of our review, "an award of prejudgment interest is generally not considered a matter of discretion." *Id.*

Here, MDBS' damages for Olcott's 1995 distributions are easily calculated and

---

8. Although we need not resolve the issue, as noted, there is some merit to Olcott's argument that MDBS suffered no measurable harm from any failure to physically affix "to-

kens" to a software program so long as Olcott had actually paid for or properly received the tokens, thus ensuring that MDBS received the royalties to which it was due.

clearly arose at a particular time. They arose on the date of the improper distributions, January 19 and April 1, 1995, and are calculated simply by determining the number of modules Olcott distributed without paying royalties and multiplying that number by the applicable module prices in effect at the time of the distributions. The trial court lacked discretion to deprive MDBS of a significant amount of pre-judgment interest. We reverse the trial court's decision to do so and remand for a recalculation of pre-judgment interest, beginning at the appropriate times.

 MDBS also contends that the trial court erred in not expressly including its award of attorney fees and costs in the accrual of post-judgment interest. However, the language of the post-judgment interest statute, Indiana Code Section 24–4.6–1–101, "does not require a specific award of post-judgment interest." *Grubnich v. Renner*, 746 N.E.2d 111, 115 (Ind. Ct.App.2001), *trans. denied.* Rather, a successful litigant is automatically entitled to such interest, with or without a specific court order to that effect. *See id.* at 114–15. Although MDBS is entitled to post-judgment interest on any attorney fees and costs it may be awarded, the trial court was not required to specifically state as much in its judgment.[9]

### IV. Attorney Fees and Costs

 This brings us to the final issue: whether the attorney fees and costs award of $159,567.14 to MDBS is excessive. The 1984 contract between the parties allows MDBS to recover attorney fees incurred in enforcing the contract and there is no claim that MDBS could not recover any attorney fees; Olcott only argues as to the amount. What constitutes a reasonable attorney fee is a matter largely within the trial court's discretion. *Dougherty v. Leavell,* 582 N.E.2d 442, 443 (Ind.Ct.App. 1991). In determining what is "reasonable," the court may consider such factors as the hourly rate, the result achieved, and the difficulty of the issues. *Id.*

 In the present case, we have made conclusions that will result in a significant reduction in the damages awarded to MDBS. MDBS originally sought damages, not including interest, in the amount of $438,850, based upon forty-six occasions on which Olcott allegedly distributed copies of MDBS software without attaching the appropriate tokens to the OIPMS II software. We estimate that the modified damages, without interest, will be in the neighborhood of $5450.[10] Additionally, we have concluded that because of the statute of limitations, Olcott can be liable for improper distributions occurring on only two of the forty-six occasions claimed by MDBS.

 Because of our holding, we direct the trial court on remand to reconsider the question of what would constitute a reasonable attorney fees award in this case. "An excessive attorney fee award can be avoided when fees are apportioned according to the significance of the issues upon which a party prevails, balanced against those on which the party does not prevail." *Stepp v. Duffy,* 686 N.E.2d 148, 153 (Ind. Ct.App.1997), *trans. denied* (1998); *cf. also Gershin v. Demming,* 685 N.E.2d 1125,

---

9. Because we are ordering the judgment amount to be modified but are not entirely reversing judgment in MDBS' favor, on remand post-judgment interest will accrue from the date of the trial court's original judgment but on the modified amount only. *See Beam v. Wausau Ins. Co.,* 765 N.E.2d 524, 534 (Ind. 2002).

10. This is based upon Olcott distributing two copies each of the DMS, QRS, RTL, and IDML modules in 1995, with module prices of $1000, $500, $725, and $500 respectively, and without trebling the damages.

1131 (Ind.Ct.App.1997) (holding party was "only entitled to recover the amount of appellate attorney fees that can be attributed to that portion of the appeal upon which she has prevailed" pursuant to contract provision allowing attorney fees).

 This is not to say there must be a strict proportion between the total amount of fees MDBS incurred and the amount it eventually recovered. "The United States Supreme Court has held that where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorneys' fees reduced merely because the court did not adopt every contention raised." *Citizens Action Coalition of Indiana, Inc. v. PSI Energy, Inc.,* 664 N.E.2d 401, 409 (Ind.Ct.App.1996) (citing *Hensley v. Eckerhart,* 461 U.S. 424, 440, 103 S.Ct. 1933, 1943, 76 L.Ed.2d 40 (1983)). Here, each of MDBS' claims were related. "But where the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained." *Hensley,* 461 U.S. at 440, 103 S.Ct. at 1943. In light of the fact that MDBS ultimately will recover little more than one percent of the damages it sought, on only two of the forty-six breaches of contract it claimed occurred, MDBS' success may accurately be described as limited. Hence, MDBS' attorney fees award must be reconsidered.

### Conclusion

We hold that the statute of limitations bars MDBS from recovering damages for any purported breaches of contract occurring more than four years before November 11, 1996. This leaves only two 1995 distributions of OIPMS II software containing MDBS modules for which Olcott may be liable. The trial court did not err in assessing damages for those distributions, except for enforcing the treble damages clause of the 1984 contract between the parties. The trial court erred in not assessing pre-judgment interest from the dates of Olcott's 1995 breaches of contract, but was not required to specifically provide for post-judgment interest in its order. Finally, we direct the trial court, after it has recalculated the damages and pre-judgment interest Olcott properly owes to MDBS, to reassess the amount of attorney fees to which MDBS is entitled. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

Affirmed in part, reversed in part, and remanded.

RILEY, J., and SHARPNACK, J., concur.