Bruce **BARKWILL**, Appellant,

v.

**THE CORNELIA H. BARKWILL REVOCABLE TRUST,**
Appellee.

No. 64A04–0808–CV–455.

Court of Appeals of Indiana.

March 11, 2009.

renewed every April 15, then the Bank's lien would have retained its superiority over

Wife's judgment lien.

Garrett V. Conover, Odgen Dunes, IN, Attorney for Appellant.

Richard M. Davis, Kevin G. Kerr, Hoeppner Wagner & Evans, LLP, Valparaiso, IN, Attorneys for Appellee.

## OPINION

BARNES, Judge.

### Case Summary

Bruce Barkwill appeals the trial court's conclusion that the 2006 revision to his mother Cornelia Barkwill's trust was valid. We affirm.

### Issue

We consolidate and restate the issue as whether a presumption of undue influence attached to the 2006 revision to Cornelia's trust.

### Facts

In 2006, at the age of seventy-two, Cornelia Barkwill lived independently at her home in the Beverly Shores community in northwest Indiana. Her son Jeffrey lived relatively close to her in a Chicago suburb, and her other son, Bruce, lived in Florida. Although she lived independently, Cornelia's Social Security income alone was not sufficient to support her lifestyle. Jeffrey assisted her in securing a line of credit on her home. He issued checks drawn on that line of credit to Cornelia when she requested funds. He also advanced approximately $230,000 of his own funds to her throughout the years for other expenses.

In early March of 2006, Jeffrey and his teenage daughter visited Cornelia and discovered her house in disarray and noticed that household chores such as laundry had not been done for some time. Jeffrey described Cornelia as disoriented. Jef-

frey, his wife, and their daughters returned to Beverly Shores multiple times over the next few days to assist Cornelia in cleaning, grocery shopping, and doing laundry. Jeffrey found Valium in the house and was unsure if this was a prescribed medication for Cornelia.

During this time, Cornelia called Bruce and "made some rather strange accusations" against Jeffrey and his family—that they were stealing from her, trying to take her property, and put her in an asylum. Tr. p. 27. Bruce was convinced Cornelia was either "drugged out" or paranoid. *Id.* at 29. Bruce and Jeffrey spoke on the phone and agreed to work together on getting additional assistance for Cornelia. Bruce wanted to make his own assessment of the situation and traveled to Indiana.

Bruce arrived from Florida in mid-March of 2006, and saw his mother for the first time in several years. During Bruce's visit, Cornelia requested all her locks be changed and instructed Bruce not to share the new key with Jeffrey. Cornelia kept claiming that someone had snuck into her home and used the bathroom. Also, in another exhibition of bizarre behavior, Cornelia lunged at Bruce with a steak knife, when the two had a disagreement about her eating on the floor.

Bruce set up an evaluation with Comfort Keepers, an organization that assists seniors in living independently and arranged a meeting with attorney William O'Toole in anticipation of the need for a guardianship arrangement. Bruce also took Cornelia to visit her physician, Dr. Dennis Frazier. When Dr. Frazier discovered Cornelia was obtaining Valium from the internet and abusing the drug, he refused to continue treating her as a patient, though he did write her a prescription for her regularly used medication. Bruce assisted Cornelia in filling her legitimate prescription. After obtaining the prescription, Cornelia would not communicate with Bruce, did not want to continue the visit, and denied needing any help.

Bruce had a meeting with Attorney O'Toole and Jeffrey before returning to Florida. They discussed plans for further evaluations of Cornelia, but those never occurred. Bruce provided Jeffrey with the new key to Cornelia's home. Attorney O'Toole's services were not used any further, and Bruce did not seek guardianship of Cornelia. The Barkwills did not enlist the services of Comfort Keepers.

Dr. Frazier resumed treating Cornelia in late June of 2006, and she told him she had stopped using Valium. When Jeffrey spoke with Cornelia in May and June, she "seemed to be back to her normal self." Tr. p. 199. He did not see her again until August, when he transported her to the Cleveland Clinic because her breast cancer, first treated there in 2005, had returned.

Cornelia met with attorney Terry Hiestand on June 21, 2006, to modify her estate plan. Her prior trust was formed in 1976, revised in 1981 and 1998, and named her sons as equal beneficiaries. Over the course of their meetings and telephone conversations, Hiestand spent about four and a half hours with Cornelia and a half an hour on the phone with her. Hiestand observed that she was competent, had a plan in mind, and had sensible reasons for her plan. Cornelia conveyed to Hiestand that she was displeased with Bruce during the recent visit and that he had not been attentive to her throughout his life. As such, Cornelia wanted to leave everything to Jeffrey. She executed the new trust on July 7, 2006, naming Jeffrey as the sole successor and beneficiary. Cornelia also asked Hiestand about the possibility of drafting a promissory note for the funds Jeffrey had advanced to her.

Cornelia did not follow up on this request, and a promissory note was never drafted.

High winds and tornados damaged Cornelia's home in August of 2006. Jeffrey assisted in moving Cornelia to a temporary apartment while a contractor made the necessary repairs to her home. That September Jeffrey took her again to the Cleveland Clinic for a mastectomy. Bruce did not accompany them to Cleveland or come to Indiana.

Cornelia passed away on April 1, 2007. Bruce filed a petition to determine interest in a trust on April 13, 2007. His petition requested the reinstatement of the 1998 trust. The trial court held a two day bench trial. It found the 2006 trust to be valid. This appeal followed.

## Analysis

■ The record does not reflect that the parties ever made a written request for the trial court to enter findings of fact and conclusions thereon under Indiana Trial Rule 52. The trial court entered findings and conclusions sua sponte, which control only the issues they cover. *Olcott Int'l. & Co., Inc. v. Micro Data Base Sys., Inc.*, 793 N.E.2d 1063, 1071 (Ind.Ct.App. 2003), *trans. denied.* We apply the following two-tier standard of review to sua sponte findings and conclusions: whether the evidence supports the findings, and whether the findings support the judgment. *Id.* Findings and conclusions will be set aside only if they are clearly erroneous, that is, when the record contains no facts or inferences supporting them. *Id.* "A judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made." *Id.* We consider only the evidence favorable to the judgment and all reasonable inferences flowing therefrom, and we will neither reweigh the evidence nor assess witness credibility. *Id.*

■ Indiana recognizes that certain legal and domestic relationships raise a presumption of trust and confidence as to the subordinate party and a corresponding influence as to the dominant party. *Meyer v. Wright,* 854 N.E.2d 57, 60 (Ind.Ct.App. 2006), *trans. denied.* We use the following burden shifting approach in reviewing transactions between such parties:

[I]f the plaintiff's evidence establishes (a) the existence of such a relationship, and (b) the questioned transaction(s) between the parties resulted in an advantage to the dominant party in whom the subordinate party had placed his or her trust and confidence, the law imposes a presumption that the transaction was the result of undue influence exerted by the dominant party, constructively fraudulent, and, therefore, void. The burden of proof then shifts to the dominant party to rebut the presumption by clear and unequivocal proof that the questioned transaction was made at arm's length and was thus valid. Undue influence has been defined as the exercise of sufficient control over the person, the validity of whose act is brought into question, to destroy his free agency and constrain him to do what he would not have done if such control had not been exercised.

*Id.* (internal citations and quotations omitted).

■ "In the relation of parent and child the parent is assumed to be the dominant party." *Westphal v. Heckman,* 185 Ind. 88, 94, 113 N.E. 299, 301 (Ind. 1916) (superceded by statute on another issue as stated in *Matter of Estate of Banko,* 622 N.E.2d 476 (Ind.1993)). However, recent cases have held that where certain adult children are caretakers for ailing parents, the children take on the dominant role. The question of which party has attained the position of the dominant par-

ty, under the evidence, is a question for the trier of fact. *Crider v. Crider,* 635 N.E.2d 204, 210 (Ind.Ct.App.1994), *trans. denied.*[1] "Where one seeks to show that the child is the dominant party, he must do so by showing the condition and situation of the parties, their treatment of each other, and other circumstances from which such ultimate fact may be inferred." *Westphal* 185 Ind. at 94, 113 N.E. at 301.

Recently, however, our court has held in several instances that as a caretaker, an adult child is in the dominant position in relation to ailing parents. The *Meyer* court dealt with an adult child, Paul, caring for an aging parent, Charles, and concluded in that case the parties' roles were reversed. 854 N.E.2d at 60. Charles lived in a nursing home and Paul had taken over duties at the family farm. Paul visited Charles daily, took him to dinner frequently, and transported him to the attorney's office when necessary. We concluded in *Meyer,* "By virtue of being his father's caretaker, Paul, the child, is in the position of dominance." *Id.* The court based its reasoning on *Supervised Estate of Allender v. Allender,* 833 N.E.2d 529 (Ind.Ct.App.2005), *trans. denied,* and *Outlaw v. Danks,* 832 N.E.2d 1108 (Ind.Ct. App.2005), *trans. denied.*

In *Allender,* the aging parents hired their adult son, Termite, who was on parole, to be their caretaker. Termite and his wife obtained power of attorney over the elderly couple and obtained and then sold the couple's farmland. After the father passed away, Termite limited his mother's contact to other family members. Termite convinced a local attorney to draft a new will for his mother, leaving the entire estate to him. We concluded that Termite "was in a position of dominance here by virtue of being his ailing parents' caretaker." *Allender,* 833 N.E.2d at 533–34. In *Outlaw,* a nephew lived with and cared for his ailing blind aunt. He had authority over all her financial affairs, her home, and had generally cared for her for two years. He also drafted the will that left his aunt's estate to him. *Outlaw,* 832 N.E.2d at 1110.

Bruce argues that the trial court failed to apply the necessary presumption of undue influence by Jeffrey on Cornelia. Jeffrey counters that no presumption of undue influence attaches to his relationship with Cornelia and that Bruce misinterprets the trial court's finding on that issue. The pertinent finding is:

> 38. Bruce relies on *Meyer v. Wright,* 854 N.E.2d 57, 60–61 (Ind.Ct.App.2006) *trans. denied* and *In re Supervised Estate of Allender v. Allender,* 833 N.E.2d 529, 533 (Ind.Ct.App.2005) *trans. denied* for the proposition that a presumption of invalidity attaches to a gift from a parent to a caretaker child because the child is in a fiduciary relationship to the parent, creating an inference that the gift is the result of undue influence. The Court finds that these cases do not support this proposition and that, under the facts of the case, no presumption of undue influence attaches to the challenged action. However, the Court further finds that even if the cases cited about *do* stand for the proposition advanced by Bruce, that the facts herein overcome that presumption, resulting in a finding

---

1. In a footnote in *Crider,* Judge Friedlander, writing for himself only and not the other two members of the majority, cautioned that while he did not necessarily disagree with majority's position that "if there is any validity to indulgence in a presumption of parental domination, it should only be with respect to a minor child living in the parent's household" he relies on *Westphal* for his belief that "the current law in Indiana regarding conveyances from a parent to a child clearly requires this court to assume, at the outset, that the parent is the dominant party." *Crider,* 635 N.E.2d at 210 n. 4.

of no undue influence. Nor does the evidence support a finding of fraud, either actual or constructive.

App. p. 23 (emphasis in original).

■ The trial court seemingly rejects applying the presumption of undue influence, but conditionally acknowledges that even if such a presumption applied it would have been overcome. Jeffrey maintains that the presumption does not attach to his relationship with his mother. He points to the fact that Cornelia lived independently, and he was not a day-to-day care provider for Cornelia.

Bruce contends the financial arrangements between Jeffrey and Cornelia point to Jeffrey's obvious dominant position. The financial control Jeffrey exerted over his mother consisted of his endorsements and deposits of the checks drawn on the lines of credit. The lines of credit had been secured first by Cornelia's condominium in Chicago and later by her home in Beverly Shores but Jeffrey co-signed the agreements. Cornelia would have to request the distributions from the lines of credit from Jeffrey. Jeffrey also provided a substantial amount of personal funds, approximately $230,000, to his mother throughout the years.

These arrangements with Jeffrey, however, were not Cornelia's only means of spending. She had monthly Social Security income and had credit cards in her own name. Cornelia did not depend on Jeffrey on a daily basis. Instead, she lived alone in her own home and attended her own daily needs. Also, unlike the circumstances in the other cases, Jeffrey had no involvement in the revision to Cornelia's trust. *See, e.g., Meyer,* 854 N.E.2d at 59 (applying the presumption where decedent's son drove him to the attorney's office); *Allender,* 833 N.E.2d 529, 531 (applying the presumption where decedent parents paid their son as their full time caretaker, he had power of attorney, which he used to obtain their land, and he took an active part in finding and convincing an attorney to alter his mother's will); *Outlaw,* 832 N.E.2d at 1110 (applying the presumption where decedent's nephew drafted her form will and took her to the bank to have it notarized and witnessed). Jeffrey did not accompany Cornelia to the attorney's office, and he was not a part of preparing the documents.

Jeffrey testified that he never suggested to his mother that she alter her estate plan. In fact, Jeffrey did not see his mother during the summer of 2006. It was not until he drove her to Cleveland Clinic in August, after the trust revision, that the two met in person. Under these circumstances, we conclude that Jeffrey was not in a dominant role in the relationship with his mother at the time she changed the trust, and therefore, no presumption of undue influence attaches. Even if Jeffrey had been in the dominant role, he rebutted the presumption of undue influence with clear and convincing evidence. The trial court had ample evidence to conclude that Cornelia was competent to alter her estate plan and she was not under Jeffrey's influence in making the alterations.

Bruce insists that his March 2006 telephone conversation with Cornelia in which she expressed a mistrust of Jeffrey clearly evidences Jeffrey's undue influence and prevents any rebuttal evidence from overcoming the presumption. Cornelia's combined use of illegally obtained Valium and pain medication caused an impact on her demeanor during that time period. Whatever issues Cornelia may have been having with Jeffrey at that time seemed to have been resolved. Moreover, even Bruce testified that he believed Cornelia's complaints about Jeffrey were a result of drug abuse or paranoia. Bruce also contends that because Jeffrey suggested his mother execute a promissory note to insure he was

repaid, that somehow Jeffrey unduly influenced her to disinherit Bruce. Yet the transaction Jeffrey had encouraged, a promissory note, was not a transaction that Cornelia made on Jeffrey's behalf.

Cornelia was unwilling to accept Bruce's assistance during and after his 2006 visit and it seems anything remaining of their relationship fell apart. The record does not reveal that Bruce played an active part in his mother's life or assisted at all with transport or support during cancer treatments. Although Bruce testified that he frequently spoke with his mother on the telephone, he only saw Cornelia twice between 1998 and her death in 2007. He provided no financial assistance to her throughout the years. The record indicates the two had a rocky relationship in prior decades as well. Attorney Hiestand testified at length regarding Cornelia's express desire not to leave anything to Bruce because of her displeasure with Bruce's lifestyle and his lack of attention to her.

Cornelia chose to disinherit Bruce and that was a choice she was free and competent to make. Attorney Hiestand determined that Cornelia was competent when they met to adjust her estate plan. Her physician, Dr. Frazier, also testified that Cornelia was competent in March and June of 2006. He described her as a very sharp woman and attributed any earlier bizarre behavior reported by Bruce to drug interaction with the Valium. Cornelia was free to decide the objects of her bounty. Cornelia's 2006 revision to her trust was not a transaction to which a presumption of undue influence attached. Even if we were to attach such a presumption, Jeffrey has presented sufficient evidence to overcome it. The trial court's conclusions regarding the validly of the 2006 trust revisions are not clearly erroneous.

We note that the determination of whether Jeffrey was truly in a dominant position in his relationship with Cornelia was a highly fact-sensitive one. Cornelia lived alone in her own home, maintained her independence, and by all accounts was "crystal clear" in expressing herself. Tr. p. 146. The facts here were unlike those in the *Allender, Meyer,* and *Outlaw* cases that found adult children and a nephew to be in the dominant position over their ailing parents and an aunt, respectively.

Clearly, this is an issue that will garner continued attention as the baby boomer generation ages. We maintain that courts must proceed with caution in analyzing these situations and that an automatic presumption that any adult child who assists an aging parent is presumed to be in a dominant role and exert undue influence over that parent's decisions is ill-advised. We caution that love, attention, and occasional assistance provided by an adult child typically and naturally arise from a sense of filial duty. It seems unreasonable for our courts to rely exclusively upon care, compassion, or generosity by an adult child for their ailing parent and then render such actions suspect. These relationships must be carefully examined in light of the surrounding circumstances before any conclusions regarding that child's dominance and influence be made.

## Conclusion

The trial court's findings and conclusions are not clearly erroneous. No presumption of undue influence attaches to Jeffrey's relationship with his mother. The trial court's conclusion that Cornelia's 2006 trust revision is valid is supported by the evidence. We affirm.

Affirmed.

BAILEY, J., and MATHIAS, J., concur.