Frederick W. DENNERLINE, III, and Fillenwarth, Dennerline, Groth & Towe, Appellants–Defendants,

v.

Jim ATTERHOLT, Insurance Commissioner of the State of Indiana as Liquidator of Indiana Construction Industry Trust (ICIT), Appellee–Plaintiff.

No. 49A04–0610–CV–557.

Court of Appeals of Indiana.

May 16, 2008.

Rehearing Denied July 17, 2008.

David C. Jensen, David J. Beach, Eich-horn & Eichhorn, Hammond, IN, Attorneys for Appellants.

Irwin B. Levin, Richard E. Shevitz, Arend J. Abel, Cohen & Malad, LLP, Indianapolis, IN, Attorneys for Appellee.

## OPINION

CRONE, Judge.

### Case Summary

Frederick W. Dennerline, III, and his law firm, Fillenwarth, Dennerline, Groth & Towe ("Dennerline"),[1] appeal from a general jury verdict and judgment in favor of Jim Atterholt, Insurance Commissioner of the State of Indiana ("the Commissioner"), on the Commissioner's complaint against Dennerline for legal malpractice that resulted in the liquidation of the Indiana Construction Industry Trust ("ICIT") and $17,991,043 in unpaid healthcare bills for ICIT's beneficiaries. We affirm.

### Issues

We reorder and restate the issues as follows:

I. Whether Dennerline has preserved any error regarding the testimony of the Commissioner's legal malpractice expert, Pete Schroeder;

II. Whether the trial court abused its discretion in ruling on Dennerline's discovery motions regarding liquidator Fred Greve;

III. Whether Dennerline is entitled to reversal based on the trial court's remarks and admission of evidence regarding the amount of ICIT's unpaid healthcare claims;

IV. Whether Dennerline is entitled to reversal based on the denial of his motion for judgment on the evidence on one of four theories of legal malpractice liability;

V. Whether Dennerline has preserved any error regarding his entitlement to setoffs for settlements the Commissioner recovered from nonparties; and

VI. Whether the trial court abused its discretion in denying Dennerline's motion to correct error as to the jury's finding that he was 100% at fault for ICIT's unpaid healthcare claims.

### Facts and Procedural History[2]

ICIT was a Multiple Employer Welfare Arrangement ("MEWA") formed in the late 1960s by a group of construction industry trade associations to provide healthcare benefits to their non-union employees. Representatives of those associations composed the Subscribing Employers Committee, which functioned as ICIT's board of trustees. ICIT provided healthcare benefits insured by Anthem Insurance Company or its predecessors until

---

**1.** Because attorney Dennerline's liability is coextensive with that of his law firm, we refer to them interchangeably as "Dennerline" in this opinion. *See* Ind.Code § 23–4–1–13 ("Where, by any wrongful act or omission of any partner acting in the ordinary course of the business of the partnership or with the authority of his copartners, loss or injury is caused to any person, not being a partner in

the partnership, or any penalty is incurred, the partnership is liable therefor to the same extent as the partner so acting or omitting to act.").

**2.** We heard oral argument on March 18, 2008, in Indianapolis. We thank the parties for their presentations.

December 31, 1999, at which point ICIT terminated its relationship with Anthem and became a self-insured MEWA.

ICIT was regulated by state and federal law, including ERISA. In 1992, the Indiana General Assembly enacted legislation providing that a self-insured MEWA must annually obtain a certificate of registration from the Indiana Department of Insurance ("IDOI") under rules to be adopted by the Commissioner. Ind.Code § 27–1–34–2(a). Those rules would govern, among other things, "(1) certificate of registration requirements; (2) reinsurance requirements; (3) reserve levels; (4) deposits; (5) financial reporting; (6) fidelity bonds; and (7) the operations; of multiple employer welfare arrangements." Ind. Code § 27–1–34–9. Indiana Code Section 27–1–34–2(b) provides that a MEWA that does not obtain a certificate of registration is subject to Indiana Code Article 27–4, which authorizes the Commissioner to fine, punish with infractions, or otherwise penalize entities that engage in activities such as unfair competition, deceptive practices, or the unauthorized transaction of business. The Commissioner did not adopt rules pursuant to Indiana Code Section 27–1–34–2(a) until 2003, after ICIT was placed in liquidation. One of those rules provides that a "MEWA may continue to conduct business until the certificate of registration is granted or denied by the commissioner." 760 IAC 1–68–2(f). Neither ICIT nor any other MEWAs were penalized by the Commissioner for operating without a certificate of registration prior to his adoption of the rules.

Also in 1992, the General Assembly enacted legislation that provides,

> If any domestic multiple employer welfare arrangement is insolvent or in imminent danger of insolvency, or fails or suspends operation between periods of examination authorized, it is a class A misdemeanor for the highest officer then actively in charge of such multiple employer welfare arrangement to knowingly fail to notify the department immediately of such condition, failure, or suspension.

Ind.Code § 27–1–34–7.

Dennerline has been licensed to practice law in Indiana since 1974 and is a partner in the Indianapolis law firm of Fillenwarth, Dennerline, Groth & Towe, a general partnership. Dennerline began providing legal advice to ICIT in 1995 and became its outside counsel in 1998. Dennerline did not have expertise with MEWAs and did not consult with anyone or conduct research regarding the laws applicable to MEWAs when he undertook representation of ICIT. Dennerline determined that there was no risk in ICIT's continued operation without the certificate of registration required by Indiana Code Section 27–1–34–2(a) because there were no rules outlining the procedure for obtaining it. It "never crossed [Dennerline's] mind" to advise the trustees to initiate a mandate action to compel the Commissioner to adopt such rules. Tr. at 597.[3]

---

**3.** Indiana Appellate Rule 50(A)(2)(g) provides that an appellant's appendix in a civil appeal shall contain *"brief* portions of the Transcript, that are important to a consideration of the issues raised on appeal[.]" (Emphasis added.) The eight-volume transcript in this case contains 1481 pages. Given the numerous issues and references to the transcript in his appellant's brief, it is understandable that Dennerline did not include portions of the transcript in his five-volume appendix, which would have substantially increased its already considerable bulk. Appellate Rule 50(A)(3) provides that an appellee's appendix in a civil appeal "shall not contain any materials already contained in [the] appellant's Appendix [but] may contain additional items that are relevant to either issues raised on appeal or on cross-appeal." Over five hundred pages of the Commissioner's four-volume appendix are

Dennerline drafted several versions of ICIT's trust agreement. Article 14.01 of the trust agreement provides that the trust "shall cease and terminate ... [i]n the event the Trust Fund or Funds shall be inadequate to carry out the intent and purposes of [the] Trust, or to meet the payments due or to become due under this Trust." Plaintiff's Exh. 10 at 46. ICIT generated an unaudited balance sheet dated September 30, 2001, which showed that its liabilities exceeded its assets by $695,989.88. Plaintiff's Exh. 1. Dennerline reviewed the September 2001 balance sheet but did not discuss it with the trustees. Notwithstanding the negative balance, Dennerline did not "even think about" the mandatory termination provision of Article 14.01 of the trust agreement. Tr. at 643. According to Dennerline, the September 2001 balance sheet "wasn't the first one to show a loss of claims against assets, but it was perhaps the first one to show that [ICIT's] assets did not meet the desired claim reserve." *Id.*

By December 2001, Dennerline was aware that claims were not being paid to ICIT's beneficiaries. *Id.* at 945. ICIT generated an unaudited balance sheet dated December 31, 2001, which Dennerline first obtained from ICIT chief operating officer Russell Roth in March 2002 in con-junction with an April 2002 board meeting. The December 2001 balance sheet listed "Precious Stones" as an asset valued at $2,932,811.00. Plaintiff's Exh. 2. The December 2001 balance sheet stated ICIT's total assets as $7,239,057.18 and its total liabilities as $7,096,309.02. Dennerline determined that the precious stones were leased and not owned and therefore were not a legitimate asset; thus, ICIT's liabilities exceeded its assets by over $2.7 million.

At the April 2002 board meeting, Dennerline did not see any balance sheets or hear any discussion about them. Dennerline did not inform the trustees about the December 2001 balance sheet or the precious stones. Also, Dennerline did not advise the trustees regarding the mandatory termination provision of Article 14.01 of the trust agreement or about the statutory duty to report a MEWA's actual or imminent insolvency to the IDOI.

In July 2002, the Commissioner initiated rehabilitation proceedings against ICIT in the trial court pursuant to Indiana Code Section 27–9–3–1. The trial court ultimately found ICIT to be insolvent, and the Commissioner initiated liquidation proceedings in August 2002.[4] In October 2002, the Commissioner filed suit against

devoted to portions of the transcript. The Commissioner's citations to the page numbers of his appendix (rather than to the page numbers of the transcript itself, as in Dennerline's brief) made our review of the record especially burdensome. In cases like this, with numerous issues and a multivolume transcript, it is far more helpful (not to mention far more economical) for all parties to cite to the transcript and not to include large portions of the transcript in their appendices. *See, e.g., In re D.J.*, 755 N.E.2d 679, 681 n. 1 (Ind.Ct.App. 2001) ("We appreciate that counsel undertook to provide in his Appendix a complete record of the relevant proceedings, and we especially appreciate that he has erred on the side of providing too much information rather than too little. However, as one of the purposes of the Appellate Rules revision was to reduce both cost and volume of paper, it is not necessary in the future to provide the Transcript in its entirety as part of the Appendix."). As a final consideration, it is also helpful for each volume of a multi-volume appendix to have a table of contents for the entire appendix.

4. Pursuant to Indiana Code Section 27–9–3–7, the Commissioner serves as the liquidator in liquidation proceedings. The Commissioner appointed Indiana Insolvency, Inc., as a special deputy liquidator in this case.

numerous defendants to satisfy the unpaid healthcare claims of ICIT's beneficiaries.[5]

In March 2003, the Commissioner filed an amended complaint asserting a legal malpractice count against Dennerline. In a motion for summary judgment, which the trial court denied, the Commissioner succinctly alleged four theories of liability, the following two of which are most relevant to this appeal. Specifically, the Commissioner alleged that Dennerline

- Failed to advise ICIT and its trustees of the legal ramifications of operating without a Certificate of Registration from the Indiana Department of Insurance.

[and]

- Failed to advise ICIT and its trustees of the legal implications of its insolvent status, particularly its obligation to cease operating altogether, after Dennerline learned that leased "Precious Stones" were listed as an asset on ICIT's financial statement and that ICIT was insolvent.

Appellants' App. at 546.

In February 2005, the trial court entered an order approving the liquidator's accounting, which showed unpaid claims totaling $17,991,043.41, approximately $12,700,000 of which were incurred after March 31, 2002. The Commissioner eventually settled with all defendants except Dennerline. Dennerline asserted a nonparty defense and named the settling defendants as nonparties. In March 2006, Dennerline's counsel withdrew and was replaced by current counsel.

A jury trial began on August 21, 2006. On August 28, 2006, the jury returned a general verdict finding Dennerline 100% at fault for the claimed damages, which the jury found to be $17,991,043. On August 29, 2006, the trial court entered judgment on the jury's verdict. Dennerline filed a motion for judgment on the evidence and to correct error, as well as a motion for remittitur, which the trial court denied. This appeal ensued. Additional facts will be provided as necessary.

**Discussion**

**I. Pete Schroeder**

The elements of a legal malpractice claim are "(1) employment of an attorney, which creates a duty to the client; (2) failure of the attorney to exercise ordinary skill and knowledge (breach of the duty); and (3) that such negligence was the proximate cause of (4) damage to the plaintiff." *Clary v. Lite Mach. Corp.,* 850 N.E.2d 423, 430 (Ind.Ct.App.2006). "[E]xpert testimony is usually required in a legal malpractice action to establish the standard of care by which the defendant attorney's conduct is measured." *Oxley v. Lenn,* 819 N.E.2d 851, 857 (Ind.Ct.App.2004).

In response to Dennerline's discovery requests, the Commissioner submitted the affidavit of attorney Pete Schroeder, who was designated as a standard-of-care witness. Dennerline filed a motion to strike Schroeder's affidavit on the basis that it failed to establish that he was familiar with the applicable standard of care. The trial court denied Dennerline's motion. Dennerline then filed a pretrial motion in limine to exclude Schroeder's testimony on the basis that he lacked sufficient expertise regarding ERISA and MEWA law to render opinions as to the applicable standard of care. The trial court also denied this motion.

At trial, the Commissioner called Schroeder to testify and established his credentials as an expert witness. The Commissioner then elicited Schroeder's opinion that Dennerline breached the ap-

---

**5.** Sally B. McCarty was the insurance commissioner when the complaint was filed.

plicable standard of care by failing to advise ICIT's trustees of the risks of operating as a self-funded MEWA without a certificate of registration as required by Indiana Code Section 27–1–34–2. Schroeder testified that Dennerline should have recommended that ICIT "shut down and say we can't comply with the statute" or filed a mandate action to compel the Commissioner to enact the applicable regulations. Tr. at 969.

Schroeder stated that Dennerline's representation also fell below the standard of care in failing to discuss with the trustees the December 2001 balance sheet showing $2.9 million worth of precious stones, which indicated that ICIT was nearly "three million dollars upside down." *Id.* at 974. Schroeder testified that, given ICIT's financial condition, Dennerline should have informed the trustees of the duty to report its actual or imminent insolvency to the IDOI pursuant to Indiana Code Section 27–1–34–7. Likewise, according to Schroeder, Dennerline should have advised the trustees of the mandatory termination provision of Article 14.01 of the trust agreement. Schroeder opined that had the trust been terminated in March 2002, when Dennerline received the December 2001 balance sheet, there "would have been a significantly reduced number of future unpaid claims because the operation of the Trust would have stopped." *Id.* at 978. Dennerline did not object to Schroeder's opinions during his testimony. The day after Schroeder testified, and after the Commissioner rested his case, Dennerline filed a motion to strike Schroeder's testimony, which the trial court denied.

On appeal, Dennerline contends that Schroeder was unqualified to testify as an expert witness under Indiana Evidence Rule 702(a)[6] and that the trial court abused its discretion in admitting his testimony. The Commissioner asserts that Dennerline waived any error by failing to object during Schroeder's testimony, noting that "to preserve error in the overruling of a pre-trial motion in limine, the appealing party also must object to the admission of the evidence at the time it is offered." *Martin v. State,* 622 N.E.2d 185, 187 (Ind.1993).

In his reply brief, Dennerline directs us to Indiana Evidence Rule 103(a), which provides,

Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and . . . . [i]n case the ruling is one admitting evidence, a *timely* objection or *motion to strike* appears of record, stating the specific ground of the objection, if the specific ground was not apparent from the context[.]

(Emphases added.) Dennerline asserts that motions to strike are "particularly appropriate for expert testimony" and suggests that his motion was timely. Appellant's Reply Br. at 23. We disagree.

In *Everage v. NIPSCO,* 825 N.E.2d 941 (Ind.Ct.App.2005), we stated,

It is the general rule that a party must object to evidence at the time it is offered into the record. A party that fails to make a timely objection or fails to file a timely motion to strike waives the right to have the evidence excluded at trial and the right on appeal to assert the admission of evidence as erroneous. In failing to make a timely objection or

---

**6.** *See* Ind. Evidence Rule 702(a) ("If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.").

motion, the party is, in effect, acquiescing in the admission of the evidence. *Id.* at 948 (citations and quotation marks omitted). In *Everage,* a witness gave testimony inconsistent with his deposition. The appellant impeached the witness with the deposition but did not object to his testimony. We determined that the appellant's subsequent motion to strike was untimely because it was not made until after the witness testified and "the trial resumed after a weekend break." *Id.*

Here, even though Dennerline was aware of Schroeder's alleged incompetency as an expert witness prior to trial, he did not object during the testimony and did not file a motion to strike until the day after Schroeder testified and after the Commissioner rested his case. Under these circumstances, we conclude that Dennerline's motion to strike was untimely and that he has therefore waived any error in the admission of Schroeder's testimony.

## II. Fred Greve

Fred Greve, vice president and assistant executive director of Indiana Insolvency, Inc., liquidated ICIT on the Commissioner's behalf. Sara Miller was a management analyst for Indiana Insolvency, Inc. In his March 2005 answers to Dennerline's interrogatories, the Commissioner disclosed that Greve and Miller had assisted him in answering the interrogatories and stated that he intended "to call various employees or agents of Indiana Insolvency, Inc. to describe the amount of damages." Appellants' App. at 839. The Commissioner further stated that "[t]he undisputed amount of the unpaid claims in this matter is in at least the total sum of $17,991,043.41, as previously approved by the Court in this liquidation proceeding." *Id.* at 840. Greve signed the Commissioner's answers to Dennerline's interrogatories. According to the Commissioner, Miller testified about damages in an Indiana Trial Rule 30(B)(6) deposition, which was attended by Dennerline's counsel. Appellee's Br. at 6 (citing Appellee's App. at 82–85).[7]

In June 2005, the Commissioner filed a "final" witness list, which did not name either Greve or Miller. On June 19, 2006, the trial court ordered the parties to file "definitive" witness lists. On July 3, 2006, the Commissioner filed a list naming Greve and Miller as witnesses.[8] In a letter dated July 14, 2006, Dennerline alleged that the Commissioner's disclosure of Greve and others was untimely and requested supplemental discovery responses and depositions. At the final pretrial hearing on July 24, 2006, the Commissioner noted that his interrogatory answers indicated his intent to call employees or agents of Indiana Insolvency, Inc., that Miller had already been deposed, and that he had told Dennerline's prior counsel in 2005 that he had intended to call either Greve or Miller as a witness at trial. The trial court ordered the Commissioner to file supplemental discovery responses but denied Dennerline's request for additional depositions.

On July 31, 2006, the Commissioner provided supplemental discovery responses indicating his intention to call Greve "to describe the amount of damages and the underlying insolvency proceeding." Appellants' App. at 884. In a letter dated

---

7. The cited pages consist only of the deposition's title page and a list of appearances. Dennerline does not dispute the Commissioner's assertion, however.

8. Dennerline states that the Commissioner's "definitive" list identified seven new witnesses. Appellants' Br. at 54. Because Dennerline addresses only Greve in any detail, we confine our discussion to the trial court's rulings regarding Greve.

August 2, 2006, Dennerline asserted that the Commissioner's responses were inadequate and requested additional supplementation. On August 4, 2006, Dennerline filed a motion to strike the testimony of Greve and others, which the trial court denied. Just before Greve testified at trial, Dennerline moved for either the exclusion of his testimony or a continuance, which the trial court denied.

On appeal, Dennerline notes that pursuant to Indiana Trial Rule 26(E)(1),

[a] party is under a duty seasonably to supplement his response with respect to any question direct addressed to:

(a) the identity and location of persons having knowledge of discoverable matters, and

(b) the identity of each person expected to be called as an expert witness at trial, the subject-matter on which he is expected to testify, and the substance of his testimony.

"This duty to supplement is absolute and is not predicated upon a court order." *P.T. Buntin M.D., P.C. v. Becker*, 727 N.E.2d 734, 737 (Ind.Ct.App.2000). Dennerline observes that "Indiana discovery rules are specifically designed to avoid surprise and ... trial by ambush[.]" *Outback Steakhouse of Fla., Inc. v. Markley*, 856 N.E.2d 65, 76 (Ind.2006). If a party fails to conform to the requirements of Trial Rule 26(E) and does not supplement discovery responses concerning experts to be called at trial, the trial court can, in its discretion, exclude the testimony of those witnesses. *P.T. Buntin*, 727 N.E.2d at 738.

Dennerline makes the following argument:

IDOI's failure to provide discovery was critical. Greve offered the only testimony which established IDOI's putative entitlement to $17.9 million in damages. He also served as the conduit for

admission of the damages order from the Liquidation Proceeding. He further appeared as IDOI's representative at trial, and offered expert opinions regarding the failure of ICIT.

Appellants' Br. at 56. Dennerline then cites a slew of cases stating that a belatedly identified witness *may* be excluded at trial or that a continuance *may* be granted to depose the witness. *Id.* at 56–57 (collecting cases). None of these cases, however, stand for the proposition that a trial court is *required* to exclude a witness or grant a continuance. Finally, Dennerline argues that "[g]iven the magnitude of the damages to which Greve testified and his opinions on the failure of ICIT, the trial court abused its discretion when it refused [him] any relief." *Id.* at 57.

"Due to the fact-sensitive nature of discovery issues, a trial court's ruling is cloaked with a strong presumption of correctness." *Hlinko v. Marlow*, 864 N.E.2d 351, 353 (Ind.Ct.App.2007), *trans. denied.* With respect to rulings on belatedly identified witnesses or exhibits, "[t]he law provides no official 'right' answer; rather, it affords the judge latitude, and our appellate second-sight will not reverse unless we are persuaded that the judge's decision was clearly against the logic and effect of the circumstances before the court." *Plohg v. NN Investors Life Ins. Co.*, 583 N.E.2d 1233, 1238 (Ind.Ct.App.1992) (alteration added), *trans. denied.*

In considering whether to permit a late amendment to a witness list, the trial court considers the danger of surprise or prejudice to the opponent and the goal of doing justice to the merits of the claim. The trial court also considers whether there has been bad faith or willfulness in failing to comply with the court's existing order.

*Bridges v. Metromedia Steakhouse Co.,* 807 N.E.2d 162, 167 (Ind.Ct.App.2004) (citation omitted).

■ The Commissioner asserts that "[t]here is no contention, nor could there be, that there was bad faith in this matter because Greve had been specifically disclosed to Dennerline's counsel previously." Appellee's Br. at 48. Dennerline does not dispute this assertion. The Commissioner further asserts that the "trial court's decision to allow Greve to testify without submitting to a second deposition as to damages under Trial Rule 30(B)(6) is not against the logic and effect of the circumstances of this action. Moreover, Dennerline made no showing that such discovery would have made any difference at trial." *Id.* We agree. The essence of Dennerline's argument on appeal is not that he was surprised by Greve's testimony, but only that it was devastating to his defense. Under these circumstances, we find no abuse of discretion in the trial court's rulings regarding Greve.

### III. Amount of ICIT's Unpaid Healthcare Claims

As mentioned above, in February 2005, the trial court entered an order approving the liquidator's accounting, which showed unpaid healthcare claims totaling $17,991,043.41. At a pretrial hearing on jury instructions in August 2005, the discussion turned to an instruction on issues. The trial court expressed its preference for keeping separate "the instructions as to the law and the instructions as to what has previously happened in this case" because the parties would have an opportunity

[t]o read those stipulations, admissions, and former findings of the court that are the law of the case to the jury. Now, I don't know how you're going to get the law of the case into the jury. How

would you approach that? That the court's made a previous finding? That the total aggregate of unpaid claims was seventeen million or some odd dollars? How is that coming in?

Tr. at 119–20.

Dennerline was willing to stipulate that the trial court entered such an order but was "not willing to stipulate that the number in that order is right." *Id.* at 120. The trial court responded, "You don't get to argue the correctness of the number until you get to the Appellate Court. You don't get to argue that to the jury." *Id.* The court further stated, "I just don't think that I can allow anyone in this case to question whether that particular number is correct. That's done. That's Res judicata. It's done." *Id.* at 121. Dennerline pointed out that he did not have an opportunity to challenge the number in the liquidation proceedings. Ultimately, however, the trial court stated, "Yeah, I'm not going to allow any testimony that argues with the $17 million dollar starting point, but I would allow any evidence that deals with what portion of that [Dennerline is] responsible for. Does that make sense? And if it doesn't, tell me." *Id.* at 138. Dennerline's counsel responded, "I understand what the court said." *Id.* During Greve's testimony, the trial court admitted the liquidation order into evidence over Dennerline's objection. *Id.* at 259.

■ On appeal, Dennerline contends that his "due process rights were violated when the trial court refused to allow him to contest damages based upon an order in a collateral proceeding to which he was not a party." Appellants' Br. at 36. We first observe that the trial court did not refuse to allow Dennerline to contest damages; in fact, Dennerline never sought to introduce evidence of a contrary amount. *Cf.* Ind. Evidence Rule 103(a) (stating that error may not be predicated upon a ruling ex-

cluding evidence unless a substantial right of the party is affected and "the substance of the evidence was made known to the court by a proper offer of proof, or was apparent from the context within which the questions were asked."). Failure to make an offer of proof results in waiver of an evidentiary issue. *Bedree v. Bedree,* 747 N.E.2d 1192, 1196 (Ind.Ct.App.2001), *trans. denied.*

Moreover, the jury instruction on damages neither mentions the $17.9 million figure nor gives binding effect to that amount:

> If you find by a preponderance of the evidence that Defendants are liable to the Plaintiff and caused damages which the Plaintiff is entitled to recover, then you must decide the amount of money that will fairly compensate for those damages.
>
> In deciding these damages, you *may* consider the amount of the unpaid claims for ICIT health care benefits in the liquidation of ICIT.
>
> You should decide the total amount of damages without regard to whether anyone other than the Defendants was at fault in causing the damages claimed.
>
> Your decision must be based on evidence relating to damages and not on guess or speculation.

Appellee's App. at 216 (final instruction number 19) (emphasis added).

 We further observe that Dennerline did not object to the admission of the liquidation order on due process grounds at trial and has therefore waived that issue on appeal. *See Pitman v. Pitman,* 717 N.E.2d 627, 633 (Ind.Ct.App. 1999) ("It is well-settled that a party cannot argue on appeal an issue which was

not properly presented to the trial court. When an issue is not presented before the trial court, appellate review of that issue is waived.") (citation omitted). Finally, we note that "[a] judgment is always evidence of the fact that such a judgment has been given, and of the legal consequences which result from that fact. This is true, whether the person against whom it was offered as evidence was a party to the action in which it was rendered or not." *Lasher v. Gerlach,* 107 Ind.App. 572, 579, 23 N.E.2d 296, 299 (1939), *trans. denied.* In sum, we find no grounds for reversal here.

### IV. Denial of Motion for Judgment on the Evidence

As mentioned above, Dennerline filed a motion for judgment on the evidence, which was directed toward only one of the Commissioner's four theories of legal malpractice liability, i.e., that Dennerline's "alleged negligence in failing to obtain a certificate of registration proximately caused the financial ruination and ultimate demise of [ICIT]." Appellants' App. at 14. The trial court denied Dennerline's motion. On appeal, Dennerline contends that the $17.9 million general verdict and judgment can be sustained only on this theory of liability, that the trial court erred in denying his motion for judgment on the evidence, and that therefore we should enter judgment in his favor.[9]

"In reviewing a trial court's ruling on a motion for judgment on the evidence, the appellate court is to consider only the evidence and reasonable inferences most favorable to the non-moving party." *PSI Energy, Inc. v. Roberts,* 829 N.E.2d 943, 950 (Ind.2005), *abrogated on other grounds by Helms v. Carmel High Sch. Vocational Bldg. Trades Corp.,* 854 N.E.2d 345 (Ind.

9. Prior to trial, Dennerline moved for summary judgment on the basis that this claim was preempted by ERISA. Given our resolu-

tion of this issue, we need not address Dennerline's contention that the trial court erred in denying his summary judgment motion.

2006). The Commissioner contends that we must "affirm the jury's general verdict if it can be sustained upon any one of the independent and unchallenged acts of malpractice." Appellee's Br. at 18. *See PSI Energy,* 829 N.E.2d at 950 ("The jury returned a general verdict. PSI challenges the verdict arguing that the evidence is not sufficient to support it, but does not challenge the jury instructions on appeal. In this procedural posture, a general verdict will be sustained if the evidence is sufficient to sustain any theory of liability.") (citation and quotation marks omitted); *Picadilly, Inc. v. Colvin,* 519 N.E.2d 1217, 1221 (Ind.1988) ("[Appellee] argues that a challenge to the sufficiency of the evidence must demonstrate inadequate evidence under every theory of liability, not merely one of many, before prejudice is established. We agree. A general verdict will be sustained if the evidence is sufficient to sustain any theory of liability."); *Nehi Beverage Co. v. Sims,* 509 N.E.2d 1125, 1128 (Ind.Ct.App.1987) ("When a jury is instructed on two or more possible theories of recovery, we will sustain the judgment on any theory supported by the evidence."), *trans. denied* (1988).

We agree with the Commissioner that the $17.9 million general verdict is supported by ample evidence that ICIT's demise was caused by Dennerline's failure to advise the trustees of their duty under Article 14.01 of the trust agreement to "cease and terminate" the trust "[i]n the event the Trust Fund or Funds shall be inadequate to carry out the intent and purposes of [the] Trust, or to meet the payments due or to become due under this Trust." Plaintiff's Exh. 10 at 46. Dennerline never challenged the sufficiency of the evidence supporting this theory of liability, some of the most damning of which came from Dennerline himself.

Dennerline admitted that if he had advised the trustees of the trust's mandatory termination provision, ICIT "[p]robably" would not have had $17.9 million in unpaid claims. Tr. at 684. The September 2001 balance sheet showed that ICIT's liabilities exceeded its assets by almost $700,000; Dennerline acknowledged that this balance sheet "wasn't the first one to show a loss of claims against assets[.]" *Id.* at 643. By December 2001, Dennerline was aware that claims were not being paid to ICIT's beneficiaries. *Id.* at 945. In March 2002, Dennerline received the December 2001 balance sheet; he determined that the precious stones listed on the balance sheet were not a legitimate asset and that therefore ICIT's liabilities exceeded its assets by over $2.7 million. Moreover, Dennerline never objected to the jury instructions on liability and damages and never challenged the verdict as excessive. In light of the foregoing, we find no grounds for reversal on this issue.

### IV. Setoffs

In his answer and amended answer, Dennerline asserted as an affirmative defense that he was "entitled to set-off for damages the [Commissioner] sustained and for any compensation paid to or on behalf of the [Commissioner] from other sources." Appellants' App. at 288, 763. The Commissioner filed a motion to strike this affirmative defense and a motion in limine to exclude evidence regarding settlements with nonparties. At a July 2006 hearing on those motions, Dennerline's counsel stated that he had no objection to those motions. *See* Appellee's App. at 91 ("There's no objection to [the motion in limine] on the part of the defendant, Your Honor."); *id.* at 92 ("There's no objection to [the motion to strike]. This is a comparative fault case."). The trial court granted the motions.

In his motion for judgment on the evidence and to correct error, as well as on appeal, Dennerline has asserted that the Commissioner received over $7 million in settlements from various nonparties and that he is "entitled to a set-off because Ind.Code § 27–9–3–9(b) does not allow a windfall recovery in excess of IDOI's liquidated damages." Appellants' Br. at 42; *see* Ind.Code § 27–9–3–9(b)(13) (stating that liquidator may "[p]rosecute any action that may exist in behalf of the creditors, members, policyholders, or shareholders of the insurer against any director or officer of the insurer, or any other person."). Dennerline contends that "[b]ecause the statute only allows the liquidator the right to assert the claims of third parties on behalf of the insolvent insurer, he cannot recover more than the amount of those claims." Appellants' Br. at 44–45.

Dennerline neglects to mention, however, that he consented to the striking of his setoff defense and to the exclusion of evidence regarding settlements with nonparties. The Commissioner correctly observes that a "party cannot invite error and then request relief on appeal based upon that ground; such an error cannot be reviewed by this court." *Olcott Int'l & Co. v. Micro Data Base Sys., Inc.*, 793 N.E.2d 1063, 1077 (Ind.Ct.App. 2003), *trans. denied*. In other words, Dennerline has waived this issue on appeal.

Waiver notwithstanding, our supreme court has held that "under Indiana's comparative fault regime, where defendants are severally liable, ... a defendant who goes to trial [does not] get credit for amounts paid by nonparty defendants who settled the [plaintiff's] claims against them[.]" *R.L. McCoy v. Jack*, 772 N.E.2d 987, 987–88 (Ind.2002). Despite his acknowledgement of this principle prior to trial, Dennerline now attempts to distinguish *R.L. McCoy* on the basis that the

Commissioner's damages in this case are liquidated and that the legislature did not intend for the Commissioner to receive a double recovery pursuant to Indiana Code Section 27–9–3–9(b)(13), which Dennerline characterizes as remedial and in derogation of the common law.

The Commissioner observes that nothing in *R.L. McCoy* "suggests a distinction between 'typical' cases and other tort cases involving 'liquidated' sums. Nor does the Comparative Fault Act's broad applicability to 'any action that is based on fault that is brought to recover damages' contain any such limitation." Appellee's Br. at 43 (quoting Ind.Code § 34–51–2–1(a)). The Commissioner contends that the fatal flaw in Dennerline's argument

> is his failure to recognize that the Commissioner did not recover more than those on whose behalf he sued can recover—he recovered exactly what they were entitled to. In other words, if the beneficiaries had sued on their own, they might have settled with some defendants and obtained judgments at trial against others for a total recovery in excess [of] their actual losses—a result specifically contemplated by the Comparative Fault Act as interpreted in *McCoy*.

*Id.*

We presume that the Commissioner is referring to the following passage in *McCoy*:

> In a comparative fault regime, the notion that a plaintiff is overcompensated when he or she settles with a defendant for more than a jury later awards takes too narrow a view of what a settlement represents. There is no "overpayment" if the parties agree on the dollar value of a several liability claim against a given defendant, even if a jury reaches a different result. A settlement payment normally incorporates an assessment of the exposure to liability. But a settle-

ment also reflects several other considerations, including the parties' desires to avoid the expense and effort of litigation and the tactical effect of eliminating a defendant and its counsel from trial. 772 N.E.2d at 990.

These considerations are valid in a typical tort case, in which the plaintiff is not a governmental entity and in which damages are not liquidated. Here, however, the Commissioner stands to recover approximately $26 million to satisfy only $17.9 million in unpaid healthcare claims. At oral argument, the Commissioner's counsel observed that the latter figure does not include the administrative costs and expenses of the liquidation proceeding and that ICIT's beneficiaries are only one (and second in priority) among numerous classes of creditors. *See* Ind.Code § 27–9–3–40 (listing priority of distribution of claims in liquidation proceeding). Indiana Code Section 27–9–3–43 indicates that any excess funds will ultimately escheat to the state.[10] Although Dennerline has waived this issue in this appeal, we believe that it merits consideration by the General Assembly and by our judiciary in future cases.

### VII. Allocation of Fault

█ Finally, Dennerline contends that the trial court improperly denied his motion to correct error as to the jury's finding that he was 100% at fault for ICIT's unpaid claims. "A decision to grant or deny a motion to correct error is reviewed for an abuse of discretion. An abuse of discretion occurs when the trial court's action is against the logic and effect of the facts and circumstances before it and the inferences that may be drawn therefrom." *City of Crawfordsville v. Price*, 778 N.E.2d 459, 461 (Ind.Ct.App.2002) (citation omitted).

With respect to fault and causation, our supreme court has stated,

Under standard negligence doctrine, in order for a defendant to be liable for a plaintiff's injury, the defendant's act or omission must be deemed to be a proximate cause of that injury. Proximate cause in Indiana negligence law has two aspects. The first—causation in fact—is a factual inquiry for the jury. If the injury would not have occurred without the defendant's negligent act or omission, there is causation in fact. A second component of proximate cause is the scope of liability. That issue, which is also for the trier of fact, turns largely on whether the injury is a natural and probable consequence, which in the light of the circumstances, should have been foreseen or anticipated. Under this doctrine, liability may not be imposed on an original negligent actor who sets into motion a chain of events if the ultimate injury was not reasonably foreseeable as the natural and probable consequence of the act or omission. Under comparative fault, the trier of fact can allocate fault to multiple contributing factors based on their relative factual causation, relative culpability, or some combination of both.

---

**10.** *See* Ind.Code § 27–9–3–43(a) ("All unclaimed funds subject to distribution remaining in the liquidator's hands when the liquidator is ready to apply to the Marion County circuit court for discharge, including the amount distributable to any creditor, shareholder, member, or other person who is unknown or cannot be found, shall be deposited with the treasurer of state, and shall be paid without interest except in accordance with section 40 of this chapter to the person entitled to it or his legal representative upon proof satisfactory to the treasurer of state of his right to it. Any amount on deposit that is not claimed within six (6) years from the discharge of the liquidator shall be treated as if abandoned and shall be escheated without formal escheat proceedings and be deposited in the state general fund.") (footnote omitted).

*City of Gary ex rel. King v. Smith & Wesson Corp.*, 801 N.E.2d 1222, 1243–44 (Ind.2003) (citations and quotation marks omitted).

■■■ The proportional allocation of fault pursuant to Indiana's Comparative Fault Act ensures "that each person whose fault contributed to cause injury bears his or her proportionate share of the total fault contributing to the injury." *Palmer v. Comprehensive Neurologic Servs., P.C.*, 864 N.E.2d 1093, 1098 (Ind.Ct.App.2007), *trans. denied.* "Under Indiana's Comparative fault scheme, a named defendant may assert a 'nonparty' defense, seeking to attribute fault to a nonparty rather than to the defendant." *Id.; see* Ind.Code § 34–51–2–14 ("In an action based on fault, a defendant may assert as a defense that the damages of the claimant were caused in full or in part by a nonparty."). A nonparty is "a person who caused or contributed to cause the alleged injury, death, or damage to property but who has not been joined in the action as a defendant." Ind. Code § 34–6–2–88.

"A defendant must affirmatively plead the nonparty defense, and the defendant carries the burden of proof on the defense." *Palmer*, 864 N.E.2d at 1099 (citing, *inter alia*, Ind.Code § 34–51–2–15).[11] When a defendant asserts a nonparty defense, the court instructs the jury to determine the percentage of fault of each party and "any person who is a nonparty." Ind. Code § 34–51–2–7(b)(1). Dennerline does

not challenge any of the jury instructions regarding fault allocation in this appeal.

■■■ The apportionment of fault is uniquely a question of fact to be decided by the factfinder. *St. Mary's Med. Ctr. of Evansville, Inc. v. Loomis*, 783 N.E.2d 274, 285 (Ind.Ct.App.2002). "[A]t some point the apportionment of fault may become a question of law for the court. But that point is reached only when there is no dispute in the evidence and the factfinder is able to come to only one logical conclusion." *Robbins v. McCarthy*, 581 N.E.2d 929, 934 (Ind.Ct.App.1991), *trans. denied* (1992). In evaluating a jury's allocation of fault, we may not reweigh the evidence, for "such is not the function of a court of review." *Imel v. Thomas*, 585 N.E.2d 712, 713 (Ind.Ct.App.1992).

Dennerline observes that "[a]pportionment is appropriate where there exists a reasonable basis upon which to determine the harm caused by multiple co-defendants." *Ridenour v. Furness*, 546 N.E.2d 322, 328 (Ind.Ct.App.1989). Dennerline claims that the Commissioner proceeded on the theory that other entities mismanaged ICIT but that none of the mismanagement mattered because "ICIT's losses would not have occurred but for Dennerline's failure to advise ICIT to shut down." Appellants' Br. at 59; *see* Tr. at 175 (Commissioner's opening statement: "Is there mismanagement in here? Is there a bunch of goofy stuff going on? You bet there is. You bet there is, but Mr. Dennerline is with them every step of the way.").[12] Dennerline contends that "the

---

11. *See* Ind.Code § 34–51–2–15 ("The burden of proof of a nonparty defense is upon the defendant, who must affirmatively plead the defense. However, this chapter does not relieve the claimant of the burden of proving that fault on the part of the defendant or defendants caused, in whole or in part, the damages of the claimant.").

12. According to Dennerline, the Commissioner's counsel made the same acknowledgement in closing argument. We note, however, that the parties' final arguments were not included in the certified transcript of evidence submitted by the court reporter. Additionally, Dennerline asserts for the first time in his reply brief that the Commissioner's "admission about the non-parties' fault in opening statement was a judicial admission which bound

undisputed evidence showed that the mismanagement of ICIT contributed to cause the losses claimed." *Id.*

■ The Commissioner responds that "[a]t trial, Dennerline made no serious effort to prove fault on the part of any *specific* nonparty. Rather, much like the shotgun approach he takes on appeal, he identified 144 non-parties in his Answer and presented the jury with a long list of 49 nonparties, hoping that the jury would allocate fault to some of them." Appellee's Br. at 53; *cf. S. Ind. Gas & Elec. Co. v. Ind. Ins. Co.,* 178 Ind.App. 505, 510, 383 N.E.2d 387, 391 (1978) (" 'It is never enough for the plaintiff to prove merely that he has been injured by the negligence of someone unidentified. Even though there is beyond all possible doubt negligence in the air, it is still necessary to bring it home to the defendant.' ") (quoting W. PROSSER, HANDBOOK OF THE LAW OF TORTS § 39 (4th ed. 1971)). The Commissioner claims that "the jury could properly find that none of the ... mismanagement which Dennerline seeks to attribute to nonparties would ever have occurred if Dennerline had done his job." Appellee's Br. at 60. He argues that the jury

> could properly conclude that Dennerline was 100% responsible for over $17 million in unpaid claims because he failed to advise ICIT of its obligations under the

[the Commissioner] and relieved Dennerline of his burden of proof; his counsel's statements in closing are also an evidentiary admission." Appellants' Reply Br. at 43. It is well settled that "[a] party may not raise an argument for the first time in its reply brief." *Naville v. Naville,* 818 N.E.2d 552, 553 n. 1 (Ind.Ct.App.2004).

**13.** This contention is based on the following ambiguous testimony from Greve:

> Q. .... Somebody needs to determine what those premiums have to be set at in order to be able to pay the claims

Mandatory Termination Provision and under the statute requiring it to report its "imminent insolvency" when it first became self-insured and when the Mandatory Termination Provision was first triggered.

*Id.* at 65.

We agree with the Commissioner's assessment of Dennerline's nonparty defense. Nevertheless, we briefly address Dennerline's arguments regarding the alleged mismanagement of the various entities associated with ICIT before its demise. Few of those arguments are longer than a paragraph, few cite any authority regarding the applicable standard of care, and all of them invite us to reweigh evidence in favor of Dennerline, which we may not do on appeal.

### A. Actuaries

Liquidator Greve and his associates determined that "one of the factors" that contributed to ICIT's downfall was its failure to "do proper underwriting to set premium claims so they covered future medical claims." Tr. at 291. One of Greve's associates, Elizabeth Lovette, opined that ICIT "didn't set aside required reserves to cover the higher than expected costs[.]" *Id.* at 294. Dennerline contends that ICIT's actuaries, first Hyers & Levy and later Milliman USA, were responsible for setting the premiums and claim reserves [13]

> that are going to go out the other side, right?
> A. That's correct.
> Q. And that somebody, could you tell the jury who that would be?
> A. That's generally—an actuary can do that. Sometimes a TPA [third party administrator] can do that. There are a number of outfits that can do that sort of thing, but an actuary is fairly typical.
> Q. Yeah, that's what it usually is, is an actuary, right?
> A. Often times.

and that "the jury was presented with uncontradicted evidence that the actuaries were negligent and their negligent underwriting contributed to cause the $17.9 million in unpaid claims." Appellants' Br. at 61. Finally, Dennerline argues that Milliman USA bears some responsibility for "erroneously reporting [to the trustees in April 2002] that the Trust had adequate reserves to meet future claims." *Id.* at 62.

The Commissioner responds that Hyers & Levy "resigned long ago, and the second actuary, Milliman USA, never provided ICIT with a formal premium structure." Appellee's Br. at 55. The Commissioner further states,

> Dennerline did not establish any of the following: (i) whether either actuary had actually underwritten the premiums charged by ICIT, or whether the premiums ICIT actually charged were established through internal underwriting; (ii) if the actuaries underwrote ICIT's premiums, whether ICIT followed those underwriting recommendations; (iii) the scope of the actuaries' engagements; (iv) any limitations on their engagements; or (v) the circumstances surrounding Hyers & Levy's resignation.

*Id.*

The Commissioner also notes that "Dennerline presented no expert testimony to establish the standard of care for actuaries, much less to show whether either actuary breached that standard." *Id.* As for Milliman USA's evaluation of the trust's financial condition, the Commissioner observes that the evaluation was unfinished and heavily caveated and apparently did

> Q. And if in the case of a business like ICIT that has an actuary, that's one of the potions [sic] that the actuary provides, isn't it?
> A. I believe so.
> Tr. at 299–300.

not take into account the December 2001 balance sheet. Dennerline did not receive this balance sheet until March 2002 and knew that it concealed a shortfall of over $2.7 million. The Commissioner argues that "[t]he evidence on which Dennerline relies establishes the uncontroversial fact that the premiums collected, after expenses, were less than the eventual claims but does not establish that the deficiency was the result of any negligence by either of the actuarial firms." *Id.* We agree.

### B. Third Party Administrator

Woods & Grooms served as ICIT's third party administrator ("TPA"), which was contractually obligated to adjudicate claims with "reasonable diligence," provide explanations of benefits, and provide monthly reports to ICIT regarding receipts and disbursements. *See* Defendants' Exh. F § § 2.3, 2.14 (TPA agreement). Dennerline contends that Woods & Grooms failed to timely process claims, failed to maintain an accurate list of beneficiaries, failed to issue monthly reports to ICIT, and, during the liquidation proceedings, underestimated the amount of unfunded claims by six to seven million dollars.[14]

According to the Commissioner, Dennerline acknowledged that Woods & Grooms could not timely process claims because it did not timely receive eligibility information from ICIT staff and because ICIT did not have sufficient funds to pay those claims. Appellee's Br. at 57 (citing Tr. at 894). Dennerline ignores Greve's testimony that there was nothing unusual about the discrepancy regarding the amount of

---

14. Dennerline also contends that Woods & Grooms sent out inaccurate premium notices. The Commissioner points out that Dennerline himself testified that ICIT was responsible for sending out premium notices, not Woods & Grooms. Appellee's Br. at 57 (citing Tr. at 911–12).

unfunded claims because claims continued to accumulate as the liquidation proceeding progressed. *Id.* (citing Tr. at 315–16). In fact, Greve testified that he found Woods & Grooms to be "[e]xtremely professional" and their computer system to be "more than adequate to do the job." Tr. at 269, 270. As for Woods & Grooms's failure to maintain an accurate list of beneficiaries and issue monthly reports, Dennerline offers no proof that Woods & Grooms was solely to blame for these failures or proximately caused ICIT's downfall. In short, the evidence does not lead to "only one logical conclusion" that the jury erred in allocating no fault to Woods & Grooms. *Robbins,* 581 N.E.2d at 934.

### C. ICIT's Management

ICIT's top management consisted of contract administrator Paul Scali, chief operating officer Russell Roth, controller David Norris, and Nancy Rainey. Dennerline asserts that Norris "prepared all of ICIT's financial statements of which all witnesses were universally critical." Appellants' Br. at 63 (citing Tr. at 402).[15] Dennerline contends that Roth was dishonest with Dennerline and the trustees, especially Jan Merkel, in presenting the December 2001 balance sheet, which listed precious stones as a $2.9 million asset; Roth claimed that this was a common practice in insurance accounting. Dennerline further contends that management "improperly withheld financial information from the trustees for eight or nine months, which prevented them from properly monitoring the financial condition of the trust." *Id.* at 64. Dennerline also points to Greve's testimony "that the scant financial information management provided was below professional standards and unacceptable." *Id.* (citing Tr. at 317).

We note that Dennerline did not call either Scali, Roth, or Norris to testify at trial. For reasons unknown, Dennerline filed a successful motion in limine to exclude any reference to their criminal convictions, which we can only presume related to their management of ICIT. Trustee Robert Palmer testified that he was told that management's delay in issuing a financial report was due to difficulties experienced by the auditors. Tr. at 431. As for Dennerline's argument regarding the December 2001 balance sheet, the Commissioner observes that

> Dennerline merely cites his own and Merkel's testimony that Roth told them that the inclusion of the precious stones on the balance sheet was a form of insurance accounting, but presented no evidence to show Roth did not, in fact, believe that to be the case, especially since insurance accounting is different than GAAP [generally accepted accounting principles] accounting.

Appellee's Br. at 59. In response to Dennerline's claims regarding management's alleged dishonesty, the Commissioner points to Dennerline's own testimony that he did not believe that management had engaged in any dishonesty. *Id.* (citing Tr. at 658–59). He further asserts that Dennerline has failed to establish that any dishonesty or misconduct by management actually caused the harm at issue. Once again, we must agree.

### D. ICIT's Trustees and Member Associations

Dennerline asserts that ICIT's trustees "were ERISA fiduciaries because they had discretionary control over the plan's management, administration or assets" and

---

**15.** This citation references the testimony of trustee Robert Palmer, who stated merely that he had "concerns" about financial statements that, to his knowledge, had been prepared by Norris. Tr. at 402.

that they had "the 'exclusive authority and discretion to manage and control the assets of the plan.'" Appellants' Br. at 64 (citing 29 U.S.C. § 1002(21)(A) and quoting 29 U.S.C. § 1103(a)). He states that an ERISA fiduciary "has a duty to act 'solely in the interests of the [plan] participants and beneficiaries ...'" and that a fiduciary "who breaches his or her fiduciary responsibilities 'shall be personally liable to make good to such plan any losses to the plan resulting from each such breach ...'" *Id.* at 64–65 (quoting 29 U.S.C. §§ 1104(a)(1) and 1109(a)).

Dennerline contends that the trustees did not provide sufficient oversight of ICIT's management and financial affairs and violated their fiduciary obligations by voting to continue the allegedly illegal practice of paying two-percent marketing fees to ICIT's member associations. Dennerline notes that "the marketing fees paid to Merkel's association, IRMCA, increased from $4,856.31 in 2000 to $23,936.07 in 2001." *Id.* at 66. Dennerline faults the trustees for failing "to take definitive action when their appointed management team did not provide financial statements for over eight months." *Id.* at 67. Dennerline points out that when Palmer attended the November 2001 trustee meeting, he saw that the September 2001 balance sheet reflected that ICIT's liabilities were greater than its assets and "was aware that ICIT had been operating at a net loss." *Id.* Nevertheless, Palmer "did not review another financial statement for eight months" and "did not call management about the lack of financial information either." *Id.* at 68.

We agree with the Commissioner that Dennerline's argument regarding the trustees boils down to a "suggestion that the Trustees failed to oversee ICIT's employees, TPA and actuaries[.]" Appellee's Br. at 60. We further agree that this suggestion is "meaningless" because "Dennerline did not establish that any of those other nonparties were at fault or caused damages." *Id.* at 60–61. The Commissioner notes that at one meeting Merkel "was so frustrated that she pounded her fist on the table in her exasperation over her inability to obtain financial information that was already in Dennerline's possession but which he did not reveal." *Id.* at 61. In fact, Merkel even attempted to set up a seminar so that the trustees could learn more about their duties.

To the extent Dennerline suggests that the trustees should have removed ICIT's management for breaching their obligations to the trust, we note that Palmer opined that evidence of such a breach was lacking and that Dennerline himself did not share his own concerns about ICIT's management with the trustees. With respect to the marketing fees, Dennerline presented no evidence that the fees were actually illegal, and it was Dennerline's duty to advise the trustees if they were. We agree with the Commissioner that "the marketing fees were far too insignificant to play a role in—much less *cause*—the damages" at issue, given the magnitude of "ICIT's multimillion-dollar financial collapse." *Id.* at 63.

As for the member associations themselves, Dennerline states only that each association was responsible for the actions of its trustee. This falls far short of establishing the associations' legal duty to ICIT, let alone whether they breached such a duty and whether the breach proximately caused the damages at issue. We conclude that the evidence does not lead to "only one logical conclusion" that the jury erred in allocating no fault to ICIT's trustees and member associations. *Robbins,* 581 N.E.2d at 934.

### E. Computer Vendor

Finally, Dennerline attempts to cast blame on Genelco, from whom the trustees purchased a computer system for in-house administrative work in July 2001. Dennerline asserts that after the system went online in January 2002, it was "riddled with 'glitches'" that resulted in "a catastrophic computer failure[,]" which in turn "caused claims to go unpaid and inaccurate premium invoicing." Appellants' Br. at 68 (quoting Tr. at 1260). Merkel compared the situation to "the BMV debacle." *Id.* According to Dennerline, the computer problems lasted for at least five months and were mentioned in the Commissioner's first accounting and liquidation petition.

The Commissioner observes that

[t]he evidence does not establish, by way of example only, (i) whether any computer problem existed (or whether the alleged computer failure was simply an excuse to justify ICIT's failure to pay claims during its final months); (ii) if a problem existed, the nature of the problem and whether it was the fault of the software vendor (rather than, for example, data entry, hardware, or maintenance problems); and (iii) if a problem existed that was Genelco's fault, whether that problem caused damages.

Appellee's Br. at 63. The Commissioner notes that Greve testified that Genelco had a good reputation in the insurance industry and had been cooperative and responsive in his dealings with them and that he had found no evidence of any computer problems during his review of ICIT's records. *Id.* at 63 (citing Tr. at 361). We find that the jury did not err in allocating no fault to Genelco.

In sum, we conclude that the trial court did not abuse its discretion in denying Dennerline's motion to correct error as to fault allocation. Accordingly, we affirm in all respects.

Affirmed.

MAY, J., concurs.

DARDEN, J., concurs and dissents with separate opinion.

DARDEN, Judge, concurring and dissenting.

I fully concur with the majority in all respects except for Issue VI; I respectfully dissent from their conclusion on that matter. Essentially, I am unable to support the approval of what I believe to be a windfall to a State agency. I would conclude that under the circumstances presented here—specifically, the statutory authority for the Commissioner's collection of claims, the substance of the damages claim asserted by the Commissioner; and that the damages had been liquidated—it is inappropriate to default to the finding that Dennerline waived the issue of whether a set-off should be imposed.

The trial court entered judgment for damages in the amount found by the jury to have been sustained: $17,991,043. On February 16, 2005, the trial court had entered an order approving the liquidator's account reflecting total unpaid claims in this amount. Nevertheless, it is undisputed that by the time of trial, the Commissioner had already recovered $7,695,494.90 toward the damages sustained by ICIT's insolvency. I find no authority whereby the Commissioner may collect the total damages awarded when that amount exceeds the actual damages after previous recoveries thereon are taken into account.

The statute authorizes the Commissioner to "[p]rosecute any action that may exist in behalf of creditors, members, policyholders, or shareholders of the insurer, or any other person." Ind.Code § 27–9–3–9(b)(13). The majority cites the statutory

provision whereby "unclaimed funds" recovered "shall be treated as if abandoned and shall be escheated" to the state. I.C. § 27–9–3–3(a). However, I cannot find that the difference between the total recovery by the Commissioner and the amount of liquidated damages constitutes either unclaimed funds or abandoned property. Therefore, inasmuch as the escheat provision does not include a reference to funds recovered upon the failure of an insurer in excess of the total claims, I read this provision to support Dennerline's argument that the Commissioner lacks the authority to recover an amount exceeding the liquidated damages.

That said, I would not accept Dennerline's argument that the damages award should be reduced by the entire $7,695,474.90 previously collected. The statute authorizes the Commissioner to prosecute an action such as this. Therefore, I find it entirely appropriate that the damages award include the agency's costs for the prosecution of this action. I would remand to the trial court for a further hearing, in which the trial court would establish whether there are any unsettled claims and the agency's reasonable expenses in this matter (including attorney fees and interest); and I would direct that the damages award be adjusted accordingly.